RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TIMOTHY ETHERTON,

       *Petitioner-Appellant,*

    *v.*

STEVEN RIVARD,

       *Respondent-Appellee.*

No. 14-1373

Appeal from the United States District Court .
for the Eastern District of Michigan at Detroit
No. 2:11-cv-11958—Arthur J. Tarnow, District Judge.

Decided and Filed: September 2, 2015

Before: KETHLEDGE and DONALD, Circuit Judges; McCALLA, District Judge.[*]

---

## COUNSEL

**ON BRIEF:** James Sterling Lawrence, Southfield, Michigan, for Appellant. David H. Goodkin, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

    McCALLA, D.J., delivered the opinion of the court in which DONALD, J., joined. KETHLEDGE, J. (pp. 24–25), delivered a separate dissenting opinion.

---

## OPINION

---

    JON P. McCALLA, District Judge. On February 15, 2007, a Michigan jury convicted Timothy Etherton of possession with intent to deliver cocaine. After exhausting both direct and collateral appellate review procedures in Michigan, Etherton timely filed a petition for writ

---

[*] The Honorable Jon P. McCalla, United States District Judge for the Western District of Tennessee, sitting by designation.

1

habeas corpus in the United States District Court for the Eastern District of Michigan. The district court denied Etherton's petition but certified for appeal four issues: (1) whether the anonymous tip presented at trial denied Etherton's right to confrontation under the Sixth Amendment so as to result in prejudice; (2) whether the prosecutor improperly vouched for the credibility of a witness during closing argument; (3) whether Etherton's counsel's failure to object to the anonymous tip, as well as other alleged shortcomings, amounted to prejudicially ineffective assistance of counsel; and (4) whether Etherton was prejudiced by ineffective assistance of counsel on appeal. For the reasons discussed below, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's decision, and **REMAND** with directions to issue a writ of habeas corpus unless Etherton is afforded a new appeal or, in the alternative, is granted a new trial.

**I**

**A**

Timothy Etherton was tried in Michigan State Court on a single count of possession with intent to deliver 50 grams or more but less than 450 grams of cocaine. (R. 5-3, 5-4.) The trial began with voir dire at 9:09 a.m. on February 15, 2007. (R. 5-3 at PageID 243.) The prosecutor called his first witness at 10:59 a.m. (R. 5-3 at PageID 315.) After roughly forty-five minutes of testimony, the jury broke for lunch and returned approximately an hour later. (R. 5-3 at PageID 341–42.) At 3:18 p.m., the final witness stepped down. (R. 5-4 at PageID 441.) The jury began deliberations at 5:16 p.m. and returned a verdict of guilty at 6:10 p.m. that same day. (R. 5-4 at PageID 496, 499–500.)

During trial, the prosecution called six witnesses, (R. 5-3 at PageID 314, 342, 370, 380, 388, 421), and introduced three exhibits into evidence: a video tape of the stop and search of Etherton's car (R. 5-3 at PageID 322); a bag of cocaine (R. 5-3 at PageID 354); and a plastic bag (R. 5-3 at PageID 354).

The following facts were not contested at trial: Etherton was driving a white Audi on I-96 between Detroit and Grand Rapids at the time he was pulled over for speeding; Etherton admitted that the Audi was his car; co-defendant Ryan Pollie was in the passenger seat; Etherton

initially did not consent to a search of the car, but then quickly did consent to a search; Trooper Trevin Antcliff did a preliminary physical search of the car, but did not find anything illegal; a K-9 unit was called to the scene and searched the car, but also did not find anything illegal; Detective Adam Mercer then searched the car and ultimately found a 125.2 gram bag of cocaine under an empty bag of potato chips in the map compartment of the driver's side door. Although the bag was tested, neither Etherton's nor Pollie's fingerprints were found on the bag.

The only evidence that Etherton had knowledge that the cocaine was in the car—aside from potential inferences that could arguably be drawn from the above-mentioned evidence— came from two sources: first, the testimony of Etherton's co-defendant, Pollie; and, second, an anonymous tip that was introduced for its truth.

**1**

On direct examination, Pollie testified in some detail regarding the day that he and Etherton were arrested. (R. 5-4 at PageID 388–94.) Pollie stated that he accompanied Etherton on a trip to Detroit in order to drop off members of Etherton's family at the airport. (R. 5-4 at PageID 388–89.) According to Pollie, Etherton dropped him off at a Ruby Tuesday's restaurant while Pollie "was under the assumption that [Etherton] was going to the airport to drop these family members off." (R. 5-4 at PageID 390.) Pollie testified that he had a couple of beers while he was at the restaurant before Etherton came back to pick him up approximately thirty to forty-five minutes later. (R. 5-4 at PageID 390–91.) Pollie stated that after he and Etherton got back in the car:

> [W]e pull out of the parking lot and we're about to get onto the highway and that's when the package of cocaine became known to myself. He showed it to me. I held it like kind of, wow you know that's quit [*sic*] a bit. Gave it back to him.

(R. 5-4 at PageID 391:4–8.) Pollie went on to explain that he and Etherton talked about how he had obtained the cocaine. According to Pollie:

> [Etherton] met a guy down by McDonald's, I think it was further down the road from the Ruby Tuesday's. . . . What initially was supposed to happen was the title for his vehicle was supposed to go up to pay for the---I guess as collateral and the vehicle had got transferred from his dad's name the previous day into his name so he didn't have the title. So he was supposed to return there by Sunday to go

ahead and pay the money for the cocaine that was given to him that day. . . . [Etherton] made a comment about, you know, I can do a certain amount of it and then still be able to go ahead and sell the rest for payment.

(R. 5-4 at PageID 392:7–25.)

Pollie also testified on direct that he was testifying as part of a plea agreement. (R. 5-4 at PageID 389.) Pollie acknowledged that he was to be sentenced to nine months in jail as a result of the plea. (*Id.*)

On cross, redirect, and recross-examination, Pollie acknowledged at least eight facts that were damaging to his testimony. (*See* R. 5-4 at PageID 402–411, 418–21.) First, he disclosed on redirect examination that he had read the police reports concerning both his arrest and Etherton's. (R. 5-4 at PageID 416.) Second, he acknowledged that he had been convicted of both cocaine possession and distribution in the past. (R. 5-4 at PageID 409–10.) Third, he admitted that he had been alone in the car on the day of the arrest. (R. 5-4 at PageID 403.) Fourth, he conceded that he had eaten chips that day:

> Q. Now there was testimony that the cocaine was found on the driver's side door and there were chips----a bag of chips covering it.
>
> A. I don't know what was covering it. I wasn't able to see that side of the vehicle when the cop took that out----took that out of wherever he found it.
>
> Q. Okay but you admitted that you had chips that day?
>
> A. I did.

(R. 5-4 at PageID 405:18–25.) Fifth, Pollie admitted that he was allowed to plead to a lesser charge when he was otherwise facing what he agreed was "a very lengthy incarceration." (R. 5-4 at PageID 409, 420.) Sixth, Pollie testified that he believed his fingerprints would be on the bag of cocaine. (R. 5-4 at PageID 405:18–25.) Specifically, Pollie testified:

> Q. And you plead[ed] also not just for a deal but because you knew your finger prints were going to come back on the---or you thought they were going to come back on the bag, didn't you?
>
> A. That's correct. I explained---
>
> Q. Because you had handled the bag?
>
> A. I did.

(R. 5-4 at PageID 405:18–25.)  Seventh, he acknowledged that he had initially lied to the police and had only changed his story when offered a plea deal.  (R. 5-4 at PageID 416, 419–20.)  Last, defense counsel impeached Pollie concerning his testimony regarding not driving.  The following exchange occurred on cross-examination after defense counsel asked whether Pollie had driven on the way to Detroit:

> A. I do not have a driver's license, so no I did not drive.
>
> Q. Well, that doesn't mean you can't drive.  Have you never driven without---you're telling---how long have you not had a license?
>
> A. I'm not sure actually.  Probably about a year.
>
> Q. Okay and you're telling the jury that in a year you have never driven a vehicle?
>
> A. Oh, I have.  But I didn't on that day.

(R. 5-4 at PageID 405:18–25.)  On recross-examination, defense counsel once again asked about Pollie's driving:

> Q. Okay and also sir you said that you don't drive or that you wouldn't have driven that day but isn't it true that Mr. Etherton actually passed you driving in a truck, I think it was his brother's truck or roommate[']s Blazer, when he went to pick you up?
>
> A. Yeah, I went to cash my check.  That's correct.
>
> Q. Okay, so you admit that you were driving earlier that day when you just said you wouldn't have been driving.
>
> A. I didn't drive his vehicle but I can admit to driving to cash my check.

(R. 5-4 at PageID 420:21–422:5.)

## 2

Recognizing the factual questions inherent in Pollie's testimony, the Court must examine the role of the accusatory content of the tip testimony in the trial.  Testimony regarding the anonymous tip was elicited by the prosecution on three separate occasions.  The first elicitation occurred during the direct examination of Trooper Antcliff of the Michigan State Police, who testified that he pulled over Etherton's car.  (R. 5-3 at PageID 315–17.)  The prosecutor asked Antcliff why he pulled Etherton over.  (R. 5-3 at PageID 316:15–316:16.)  Antcliff responded:

Well, on our radio I received a call from Lieutenant that the CMET team, Lieutenant Roe, and he advised that there was a white Audi matching the description from an anonymous tip that we were looking for. A BOL was put out for us, a be on the look out [*sic*] for a white Audi with two while [*sic*] males traveling from Grand Rapids to Detroit back to Grand Rapids, possibly carrying cocaine in the vehicle. . . . So Lieutenant Roe advised that he had---the possible suspect vehicle in sight. I was in position near Lieutenant Roe's vehicle, he advised me that the suspect vehicle was in front of him.

(R. 5-3 at PageID 316:17–317:4.)

The prosecutor then elicited testimony regarding the tip for a second time during the direct examination of Detective Mercer, who stated:

We wanted, based on the tip, we wanted to try and separate the two passengers of the vehicle, the driver and the passenger and give a short interview and see if their stories matched up and if they didn't that would add to our probable cause and go along with the tip that we had received.

(R. 5-3 at Page ID 344:21–345:1.)

The third time the prosecutor elicited testimony regarding the tip was from Detective Sergeant Joel Abendroth. (R. 5-4 at PageID 427.) The prosecutor specifically asked Abendroth about the tip: "[T]o cut to the chase, in regard to the defendant here did you receive some sort of tip earlier in the day?" (R. 5-4 at PageID 427:7–8.) Abendroth responded:

Yes, we did. We received a very specific tip. I followed up personally on the tip and spoke to the individual that received the anonymous call. The tip consisted of information provided to a secretary at the Grand Rapids vice unit, reference [to] a specific vehicle, a white Audi, occupied by two individuals, two white males. The tip was specific on the time frame they were going to be leaving Grand Rapids and specific on the approximate time frame returning back. It also included a route of travel along I-96. The tip was that the---

(R. 5-4 at PageID 427:9–18.) At this point, defense counsel objected to Abendroth's testimony as hearsay. (R. 5-4 at PageID 427:19–21.) The trial judge did not rule on the objection; the prosecutor simply stated, "I'll move on, your Honor," and then proceeded to ask her next question. (R. 5-4 at PageID 427:22–24.) The prosecutor next asked, "You received a tip?" (R. 5-4 at PageID 427:24.) Abendroth responded, "Yes." (R. 5-4 at PageID 427:25.) The prosecutor then inquired "who Grand Rapids vice is." (R. 5-4 at PageID 428:1.) Abendroth

responded that "Grand Rapids vice is the drug team for the City of Grand Rapids." (R. 5-4 at PageID 428:2–3.)

Having elicited testimony regarding the tip in its case-in-chief, the prosecution used the content of the tip during closing argument:

> We started out with Trooper Antcliff and you got to see the video, which is kind of neat cause that doesn't always happen but you saw what precipitated this. There was a tip that a white Audi would be traveling at such and such time on I-96 with two white males that came in through the drug team in Grand Rapids . . . .

(R. 5-4 at PageID 452:9–14.) During his rebuttal argument, the prosecutor once again discussed the content of the tip:

> What [the witnesses] did talk about was this tip that they received and coincidently, the defendant and his car matched the tip headed west from Detroit to Grand Rapids. Was there another Audi stopped that day, yeah and they told you about that. But this is the Audi that was found later in the day that matched the tip, two white males heading from Detroit to Grand Rapids, and coincidently they have a hundred and twenty-five grams of cocaine in the car.

(R. 5-4 at PageID 476:8–16.)[1]

---

[1]The prosecution also made comments in closing that Etherton argues amounted to improper vouching for Pollie:

> And honestly enough, what else did he tell you? . . . Do I wish that we could bring somebody in here that doesn't have a criminal history, who doesn't have prior drug convictions and who didn't lie to the police when he initially encountered them? Heck yeah I wish we could do that but those aren't the kind of people we're dealing with in the drug culture, the drug world. So what we have is Mr. Pollie who came in here and was incredibly frank with you.
>
> . . .
>
> What else did Mr. Pollie do today that would suggest to you that he was lying? Let me point out some of his testimony and she raised it. He said I never drove his car and then a follow up question, because I don't have a license. Well are you saying you never drive? What did he say, when she asked him didn't he pass you driving before he got to your house? Yeah, he did. He admitted under oath on the stand that he was committing another crime today. Thus exposing himself to potentially more criminal charges. Does that sound like somebody is lying to you, someone who is not trying to be truthful with you? Somebody who is arguing with the----the attorney? That's one of the questions the Judge will give you when you're judging creditability. Did he sound like somebody who was hiding something, arguing with the attorney? No, in fact he admitted another crime today that he as [sic] committing in answering her questions truthfully.

(R. 5-4 at PageID 455:1–456:5, 479:9–480:1.)

**B**

Following his conviction, Etherton was sentenced to twenty to forty years in prison. (R. 5-5 at PageID 515.)  Etherton sought relief on both direct and collateral appeal in the State of Michigan.  On direct review, Etherton's counsel sought a reversal of the conviction on four grounds: (1) that the trial court abused its discretion in denying defendant's request for an adjournment of trial; (2) that defense counsel was ineffective for failing to adequately prepare for trial; (3) that the trial court erred in denying defendant's motion to suppress the evidence found in Etherton's car; and (4) on the basis of purportedly newly discovered evidence.  (R. 5-7 at PageID 641–80.)  The Michigan Court of Appeals affirmed the trial court on October 16, 2008. (R. 5-7 at PageID 706–14.)  On February 24, 2009, the Michigan Supreme Court denied Etherton's application for leave to appeal.  (R. 5-8.)

Etherton subsequently filed a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Rules of Court.  (R. 5-11.)  In the motion, Etherton argued six grounds for relief: (1) that the anonymous tip was hearsay and violated his right to confrontation; (2) that the prosecutor improperly explained during closing argument why he had given a plea deal to Pollie but not Etherton; (3) that the prosecutor acted improperly in closing argument by vouching for Pollie's credibility; (4) that the prosecution presented false testimony; (5) that defense counsel at trial was ineffective; and (6) that appellate counsel was ineffective.  (R. 5-11 at PageID 920-22.)  The Circuit Court for Ionia County denied the motion.  (R. 5-12.)  That court found that the first five grounds were procedurally defaulted under M.C.R. 6.508(D)(3), which prohibits granting a petitioner relief on grounds "other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence."  (R. 5-12 at PageID 987.) Because the first five asserted grounds were not jurisdictional and could have been—but were not—raised on appeal, the Ionia County Circuit Court declined to review them on the merits. (*See id.*)  The court only considered Etherton's argument that his appellate counsel was ineffective, denying the motion on the basis of both sound strategy and a lack of prejudice.  (R. 5-12 at PageID 988.)

The Michigan Court of Appeals denied Etherton's application for leave to appeal, noting that Etherton had "failed to meet his burden of establishing entitlement to relief under

MCR 6.508(D)." (R. 5-9 at PageID 773.) On October 26, 2010, the Supreme Court of Michigan again denied Etherton's application for leave to appeal on the same grounds. (R. 5-10.)

## C

Etherton timely filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254 on May 4, 2011. (R. 1.) His petition asserted the same six grounds that he had raised on collateral review in the state courts of Michigan. (*Id.*) On February 26, 2014, the United States Court for the Eastern District of Michigan issued an opinion denying Etherton's petition for relief and certifying four issues for appeal: (1) whether the admission of the anonymous tip violated Etherton's right to confrontation and was prejudicial; (2) whether the prosecution improperly vouched for Pollie's credibility; (3) whether trial counsel was constitutionally ineffective; and (4) whether appellate counsel was constitutionally ineffective. Etherton now argues that each issue entitles him to a new trial. Rivard argues in response that the first three issues certified for appeal were procedurally defaulted by Etherton when he failed to raise them on direct appeal and that, in any case, none of the four issues raised entitles Etherton to relief on the merits.

## II

We agree that Etherton has procedurally defaulted the first three claims certified for appeal. A habeas petitioner procedurally defaults a claim if four conditions are met:

> "(1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default."

*Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc) (quoting *Tolliver v. Sheets*, 594 F.3d 900, 928 n.11 (6th Cir. 2010)).

Etherton argues that there is no state procedural rule that barred him from raising new arguments in his motion for relief from judgment. He is mistaken. As noted in Part I.B, *supra*, M.C.R. 6.508(D)(3) prohibits granting a petitioner relief on grounds "other than jurisdictional defects, which could have been raised on appeal." Etherton does not argue that the first three grounds certified for appeal were jurisdictional defects, nor does he argue that they could not

have been raised on direct appeal.  We therefore conclude that Etherton failed to comply with a state procedural rule.

As to the second condition, the Supreme Court has held that there is a presumption that a state court denying a federal claim "adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 131 S. Ct. 770, 784–85 (2011).  As we noted in *Barton v. Warden*, the presumption is rebuttable.  786 F.3d 450, 460 (6th Cir. 2015).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 131 S. Ct. at 785 (citing *Yist v. Nunnemaker*, 501 U.S. 797, 803 (1991)).  In general, however, "we may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

In this case, the state courts applied the procedural rule.  Where the short orders of appellate courts "are ambiguous as to whether they refer to procedural default or denial of relief on the merits," we must "look to the last reasoned state court opinion to determine the basis for the state court's rejection of [a petitioner's] claim." *Guilmette*, 624 F.3d at 291.  Because both the intermediate and supreme courts simply issued form orders in this case finding that Etherton had not met his burden to establish relief under M.C.R. 6.508(D), we look to the Ionia County Circuit Court's decision.  (R. 5-12.)

Although the Ionia County Court's decision is far from clear, it unambiguously relies on a procedural rule in dismissing the first three claims certified for appeal in this case.  The court begins its opinion by questioning "whether the court can even grant relief under MCR 6.508(D)(3)."  (R. 5-12 at PageID 987.)  According to the court's opinion, "[w]ith the exception of the failure to appoint counsel, constitutional violations, including the denial of effective assistance of counsel, do not constitute a jurisdictional defect under MCR 6.508(D)." (*Id.*)  The court then addressed only one of Etherton's claims on the merits: his claim for ineffective assistance of appellate counsel.  (R. 5-12 at PageID 988.)  Without further discussing any of his other claims, the court denied Etherton's motion.  (*Id.*)  Because of the unambiguous references to MCR 6.508(D)(3)—which applies only in cases of procedural default—and the context of the opinion that makes a ruling on the basis of procedural default as opposed to a

finding on the merits the more likely explanation, we find that the state courts enforced their procedural default rule as to Etherton's first three claims.

Procedural default is not, however, an absolute bar to habeas relief. *See McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). "Ineffective assistance of counsel can supply the cause that, together with prejudice, would excuse a procedural default." *Id.* (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). We therefore turn to the fourth issue certified for appeal: whether Etherton's appellate counsel was constitutionally ineffective.

## III

Because the Michigan courts ruled on the merits of Etherton's ineffective assistance of appellate counsel claim (*see* R. 5-12 at PageID 988), Etherton is only entitled to relief if he can demonstrate that the ruling was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). At issue in this case is whether the Michigan court's ruling was "an unreasonable application" of clearly established Federal law.

Under the "unreasonable application" clause, habeas relief is available in two scenarios: first, if "the state court correctly identifie[s] the correct legal principle from Supreme Court precedent but unreasonably applie[s] that principle to the facts of the case before it," *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003); and second, when a "state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context," *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006).

We first consider whether the Michigan court "identified the correct legal principle." *Dennis*, 354 F.3d at 517. To prevail on a habeas petition on the basis of ineffective assistance of appellate counsel, a habeas petitioner must demonstrate that his appellate counsel's failure to raise a potentially meritorious argument rose to the level of a constitutional violation under *Strickland v. Washington*, 466 U.S. 668 (1984). *Smith v. Robbins*, 528 U.S. 259, 289 (2000). To meet this burden, a petitioner must satisfy two prongs: deficiency and prejudice. In order to demonstrate deficiency, a petitioner must show his "counsel's representation fell below an

objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To demonstrate prejudice, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Consequently, in the appellate context as to counsel's failure to raise a claim, a petitioner must show that "there is a reasonable probability that the claim would have prevailed at the time counsel failed to raise it." *McFarland*, 356 F.3d at 699.

The Michigan court applied the correct legal principal from Supreme Court precedent. (*See* R. 5-12 at PageID 988 (considering, under state law, an analogous two prongs in evaluating the merits of Etherton's ineffective assistance of appellate counsel claim).) Accordingly, we consider whether the Michigan court "unreasonably applied that principle to the facts of the case before it." *Dennis*, 354 F.3d at 517. That requires us to determine whether, once a *Strickland* violation is found, "it is possible fairminded jurists could disagree." *Harrington*, 562 U.S. at 102.

Etherton argues that his appellate counsel was constitutionally ineffective for failing to raise any of the five issues raised in his Motion for Relief from Judgment (R-11). We address each in turn.

**A**

We begin by considering whether the Michigan court unreasonably applied *Strickland* in addressing Etherton's argument that his appellate counsel was constitutionally ineffective for failing to argue that his confrontation rights were violated. The admission of the content of an anonymous tip should have alerted Etherton's appellate counsel as to the presence of a serious Confrontation Clause issue. Many less meritorious issues were raised on direct appeal in this case, which suggests that the failure to raise the issue was an oversight and not deliberate strategy. *See Smith*, 528 U.S. at 288 ("'[W]hen ignored issues are clearly stronger than those presented, . . . the presumption of effective assistance of counsel [is] overcome.'") (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)); *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003); *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir. 1998). In these circumstances, "the ineffectiveness prong of *Strickland* turns on whether an objectively reasonable attorney would have presented the issue for plain error review because it had a reasonable likelihood of success."

*Roe*, 160 F.3d at 419.  In other words, both prongs of *Strickland* in this case turn on the same issue regarding appellate counsel's failure to present a Confrontation Clause argument: whether there is a reasonable probability that Etherton would have prevailed on appeal if the issue were raised.

As a threshold matter, we note that without a constitutional violation, there would have been no chance of success on appeal.  Consequently, we first address whether Etherton's confrontation rights were violated.  We then address whether the violation was sufficiently serious such that there was a reasonable probability Etherton would have prevailed on appeal. *Strickland*, 466 U.S. at 694.

**1**

The Confrontation Clause categorically prohibits the introduction of a certain class of out-of-court statements.  *Cf. Crawford v. Washington*, 541 U.S. 36, 54 (2004).  There are two necessary and mutually sufficient conditions to identify whether an out-of-court statement implicates the protection of the Confrontation Clause.  *See id.*  First, the statement must be testimonial.  *Id.*  Second, the statement must be introduced for its truth.  *See id.*

The Supreme Court stated in *Crawford* that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused."  541 U.S. at 50.  Consequently, the Court held that "[t]he Sixth Amendment must be interpreted with this focus in mind."  *Id.*  The Court explained that "[t]he text of the Confrontation Clause reflects this focus.  It applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'"  *Id.* at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)).  The Court noted that various formulations of what might constitute a testimonial statement existed, *id.* at 51–52, and held—without endorsing any particular formulation—that "[s]tatements taken by police officers in the course of interrogations" are per se testimonial.  *Id.* at 52.

*Davis v. Washington* was the next case that presented the Supreme Court an opportunity to elaborate on what constitutes a testimonial statement.  547 U.S. 813 (2006).  *Davis* concerned the admission of a recorded statement made to a 911 operator.  *Id.* at 817.  The Court carved an

exception to its ultimate holding in *Crawford* to mirror the emergency exception to *Miranda* announced in *New York v. Quarles*, 467 U.S. 649, 658–59 (1984).  The *Davis* Court held that when the totality of the circumstances objectively indicates that the primary purpose of police interrogation is "to enable police assistance to meet an ongoing emergency," statements made in response are not testimonial.  547 U.S. at 828.

Although in both *Crawford* and *Davis*, the Court's holdings applied to statements made in response to police interrogation, the Court made clear that it was not implying that "statements made in the absence of any interrogation are necessarily nontestimonial." *Davis*, 547 U.S. at 822 n.1.  In fact, the Court reiterated in *Melendez-Diaz v. Massachusetts* that volunteered testimony can trigger the protections of the Confrontation Clause.  557 U.S. 305, 316–17 (2009).  The Court asserted that "'[t]he Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation.'" *Id.* at 316 (quoting *Davis*, 547 U.S. at 822 n.1); *see also Davis*, 547 U.S. at 822 n.1  (noting that "[p]art of the evidence against Sir Walter Raleigh was a letter from Lord Cobham that was plainly *not* the result of sustained questioning"); *Crawford*, 541 U.S. at 51–52 (describing one formulation of testimonial statements as "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" (internal citations and quotation marks omitted)).

In this case, an anonymous tipster made a formal accusation to government officers.  It was therefore testimonial.[2]  *See Davis*, 547 U.S. at 824 ("'An accuser who makes a formal statement to government officers bears testimony . . . .'") (quoting *Crawford*, 541 U.S. at 51).

---

[2]We had occasion to consider directly whether the content of an anonymous tip is testimonial in *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004).  In that case, we held that "statements of a confidential informant are testimonial." *Id.* at 670.  We stated in *Cromer* not just that the admission of an anonymous tip was unconstitutional, but further held that "[t]he allowance of anonymous accusations of crime without any opportunity for cross-examination would make a mockery of the Confrontation Clause." *Id.* at 675.  Every other circuit court that has considered this issue is in accord.  *United States v. Maher*, 454 F.3d 13, 22–23 (1st Cir. 2006); *United States v. Adams*, 628 F.3d 407, 417 (7th Cir. 2010) (finding a Confrontation Clause violation in the admission of a confidential informant's statement to a police officer that stated the defendant "was involved in drugs, had a large amount of money on him[,] was on his way to buy crack, and describ[ing] the car [the defendant] was driving"); *United States v. Holmes*, 620 F.3d 836, 841 (8th Cir. 2010); *United States v. Lopez-Medina*, 596 F.3d 716, 730 (10th Cir. 2010).

The content of the tip was also admitted into evidence for its truth. It was elicited by the prosecution from three different witnesses during its case-in-chief, and the prosecution emphasized the tip during closing argument: "[T]his is the Audi that was found later in the day that matched the tip, two white males heading from Detroit to Grand Rapids, and coincidently they have a hundred and twenty-five grams of cocaine in the car." (R. 5-4 at PageID 476:8–16.) The prosecutor's repeated references both to the existence and the details of the content of the tip went far beyond what was necessary for background—thereby indicating the content of the tip was admitted for its truth.

Accordingly, it was error to admit the content of the anonymous tip in this case. We now consider whether, if Etherton's appellate counsel had raised the issue on appeal, there would have been a reasonable probability that his appeal would have been successful. *Strickland*, 466 U.S. at 694.

**2**

On direct appeal, a preserved objection to a federal constitutional violation necessitates reversal unless the error was "'harmless beyond a reasonable doubt.'" *Lilly v. Virginia*, 527 U.S. 116, 139–40 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). In contrast, an unpreserved objection to a constitutional violation is subject to a state's procedural forfeiture rules. *See Osborne v. Ohio*, 495 U.S. 103, 122–23 (1990) (finding no constitutional violation when the state court procedurally barred review of an unpreserved objection of a violation of the defendant's due process rights)). Although defense counsel ultimately objected to the tip at trial as hearsay (R. 5-4 at PageID 427:19–21), this did not amount to preservation of a Confrontation Clause objection under clearly established federal law. *See United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005) ("Because Defendant raised only a hearsay objection to these statements at trial, and did not challenge their admissibility on constitutional grounds, our review here is governed by the plain error standard."). Accordingly, we consider whether the Confrontation Clause violation would have been forfeited under Michigan's procedural forfeiture rules.

Michigan's procedural forfeiture rules are modeled on the plain error rule in Rule 52(b) of the Federal Rules of Criminal Procedure as interpreted by the United States Supreme Court in *United States v. Olano*, 507 U.S. 725, 731–34 (1993). *See People v. Carines*, 597 N.W.2d 130,

138 (Mich. 1999). In Michigan, to avoid forfeiture under its plain error rule, "three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 597 N.W.2d at 138 (citing *United States v. Olano*, 507 U.S. 725, 731–34 (1993)). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* Once a defendant establishes these requirements, reversal is warranted "when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* (internal quotation marks and alterations omitted).

**a**

As explained in Part III.A.1, *supra*, Etherton's right to confrontation was violated when the trial court admitted the content of the anonymous tip. Because of the clear, consistent, and voluminous precedent indicating that the admission of the content of the tip violated Etherton's rights, we find that the error was plain.[3] We therefore turn to whether the tip was prejudicial.

The district court found that the tip did not prejudice Etherton for two reasons: (1) because of "the trial court's jury instruction"; and (2) because of "the overall strength of the prosecutor's case apart from the hearsay testimony." *Etherton v. Rivard*, No. 11-11958, 2014 WL 764843, at *8 (E.D. Mich. Feb. 26, 2014). We respectfully disagree.

The trial court's attempt to issue a curative instruction did nothing to alleviate the prejudice of the tip. The trial court stated that the tip was "not evidence per [se] of the defendant's guilt." (R. 5-4 at PageID 487.) The instruction was vague, and could have been taken by a jury to mean that the tip by itself was not sufficient to find Etherton guilty, but that it could otherwise be considered for its truth. The instruction was therefore not in fact curative.

---

[3]Even before Etherton's judgment became final, appellate courts in Michigan consistently held that statements of anonymous and confidential informants made to police officers are testimonial. *People v. Chambers*, 742 N.W.2d 610, 616 (Mich. Ct. App. 2007) ("A statement by a confidential informant to the authorities generally constitutes a testimonial statement.") (citing *Cromer* at 675); *People v. Montgomery*, No. 269682, 2007 WL 3085513, at *2 (Mich. Ct. App. Oct. 23, 2007) (same); *People v. Demann*, No. 268657, 2007 WL 2404534, at *4 (Mich. Ct. App. Aug. 23, 2007) (same); *People v. Thompson*, No. 258336, 2007 WL 2051977, at *4 (Mich. Ct. App. July 17, 2007) (same); *People v. Tolbert*, No. 262792, 2006 WL 2924577, at *2 (Mich. Ct. App. Oct. 12, 2006) (same).

As to the strength of the prosecutor's case absent the tip, the evidence was underwhelming as to Etherton's knowledge of the presence of the cocaine. The government's case turned almost entirely on the uncorroborated testimony of a codefendant. Although the bag of cocaine was found in the driver's door next to Etherton, the evidence strongly indicated that it would not have been obvious to the driver. The video indicates that it took two officers and a K-9 unit more than ten minutes of searching before the bag was discovered under an empty bag of potato chips. As a result, absent Pollie's incriminating testimony, the evidence that Etherton knew the cocaine was in the car amounted to only the following three facts: (1) the cocaine was well-hidden; (2) Etherton was near the cocaine; and (3) the car belonged to Etherton. On their own, these three facts, especially in light of the presence of another person in the car, would have fallen far short of establishing beyond a reasonable doubt that Etherton had knowledge of the cocaine. *See, e.g.*, *United States v. Newsom*, 452 F.3d 593, 609 (6th Cir. 2006) (holding that a "defendant's mere presence in a car where [contraband] is found and proximity to [contraband] are insufficient proof of constructive possession"—even when the defendant is the only person in a car); *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008) (holding that "incriminating evidence must supplement a defendant's proximity to [contraband] in order to tip the scale in favor of constructive possession"). Given the prosecutor's heavy reliance on the otherwise uncorroborated testimony of a codefendant to establish *mens rea*, Etherton was vulnerable to being prejudiced by error. *See United States v. Necoechea*, 986 F.2d 1273, 1283 (9th Cir. 1993) ("[A] defendant is more likely to be prejudiced by error or misconduct when the government's case rests on uncorroborated accomplice testimony."), *as amended on denial of reh'g* (Apr. 15, 1993).

Despite this vulnerability, Respondent-Appellee argues that the information contained in the tip did not prejudice Etherton for two reasons. First, Rivard argues the tip is not prejudicial because it is "fully consistent with Etherton's defense that, while there was cocaine in the car, he did not know about it." Corrected Brief for Respondent-Appellee at 8. Second, he asserts that it caused no prejudice because the tip "stated what was, based on the other evidence presented, an undisputed fact." *Id.* at 9. The Circuit Court for Ionia County found no prejudice resulting from the admission of the tip on just these grounds. (R. 5-12 at PageID 988.)

Both Rivard and the Circuit Court for Ionia County overlook the most prejudicial aspect of the tip in this case: the tip tends to suggest improper inferences precisely because it is consistent with the admitted evidence. The content of the tip that was introduced described: (1) two white men; (2) in a White Audi; (3) driving from Grand Rapids to Detroit and back to Grand Rapids on I-96; and (4) possibly with cocaine in the vehicle. As Respondent-Appellee correctly notes, each element of the tip was ultimately corroborated by largely undisputed evidence. The corroboration, though, does not render the tip harmless. The high-degree of corroboration exacerbates the error. Any jury would be unlikely to view the similarity between the tip and the other evidence at trial as a matter of mere coincidence. As a result, the jury was likely to find the tip reliable, and thereby to draw improper inferences from the tip. For example, the tip's reference to two white men could very well have indicated that both were involved with the possession with intent to deliver the cocaine—an inference that could have been thoroughly examined given the opportunity for cross-examination, which was lacking at trial.

Because much of Pollie's testimony was reflected in the content of the tip that was put before the jury, the jury could have improperly concluded that Pollie was thereby testifying truthfully—that it was unlikely for it to be a coincidence for his testimony to line up so well with the anonymous accusation.[4]

Absent the tip that may have bolstered Pollie's testimony, there were at least eight significant reasons that the jury had to doubt Pollie. First, Pollie acknowledged that he had received a plea deal to plead to possession of cocaine and serve nine months in jail in exchange for his testimony. (R. 5-4 at PageID 389.) Second, Pollie admitted that he had initially lied to the police and only changed his story when, facing "a lengthy incarceration term," he agreed to a plea deal. (R. 5-4 at PageID 416–17, 419–20.) Third, Pollie stated that he had spent some time in the car on his own while Etherton went into Meijer to cash a check, indicating that Pollie had an opportunity to hide evidence on the driver's side of the car. (R. 5-4 at PageID 403.) Fourth, Pollie admitted that he had eaten chips on the day of the arrest, which demonstrated that the bag on top of the cocaine might have been Pollie's. (*Id.*) Fifth, Pollie acknowledged that he had handled the bag of cocaine and expected his fingerprints to be found on it. (*Id.*) Sixth, although

---

[4]Indeed, in the context of evaluating law enforcement's quantum of suspicion, corroboration renders an anonymous tip more reliable. *See, e.g.*, *Alabama v. White*, 496 U.S. 325, 331 (1990).

Pollie initially denied driving on the day of the arrest because he did not have a license, he admitted that he had in fact driven a different vehicle earlier that day. (R. 5-4 at PageID 420–21.) Seventh, Pollie acknowledged that he had both used and dealt cocaine in the past. (R. 5-4 at PageID 406.) Finally, Pollie disclosed that he had read the police reports concerning both his and Etherton's arrests, indicating an opportunity to fabricate testimony in order to conform to the expected testimony of other witnesses for the prosecution. (R. 5-4 at PageID 416.)

The entire case from opening statement to return of the verdict was less than a day. The proof presented lasted a mere four hours and nineteen minutes. In that time, the prosecution relied on the tip as a critical piece of evidence to support and corroborate the otherwise unsupported testimony of a cooperating co-defendant who admitted to having lied to the police—and to having the opportunity and motive to fabricate. Under the circumstances of this case, it is apparent that the admission of the anonymous tip was prejudicial.

**b**

Because Etherton has established each of the three conditions stated in *Carines*, we now consider whether the error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. We find that there is a reasonable probability that Etherton would have prevailed on this argument on direct review.

*People v. Shafier*, 768 N.W.2d 305 (Mich. 2009) is particularly instructive, as it was decided less than four months after the Michigan Supreme Court denied Etherton leave to appeal on direct review. In *Shafier*, the prosecutor repeatedly referred to the defendant's post-*Miranda* silence throughout trial, including during closing argument. *Id.* at 315. "[T]he strength of the prosecutor's overall case against defendant hinged entirely on the jury's assessments of the witnesses' credibility." *Id.* In light of the repeated nature of the error and the involvement of a constitutional right, the Michigan Supreme Court held that "there is no question that this is the sort of error that compromises the fairness, integrity, and truth-seeking function of a jury trial." *Id.* at 316. The Michigan Supreme Court elaborated, stating that the constitutional violation "rendered the trial fundamentally unfair and cast a shadow on the integrity of [Michigan's] judicial processes." *Id.*

This case bears striking similarities to *Shafier*.  The constitutional error was made repeatedly throughout Etherton's trial.  The prosecutor's case against Etherton hinged entirely on the jury's assessment of the credibility of witness testimony—in this case of one witness with the motive and opportunity to fabricate.  Accordingly, there is a reasonable probability that Michigan courts would have found on direct review that the constitutional error in this case seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence.

**3**

*Shafier* illustrates why an objectively reasonable attorney would have raised this issue for plain-error review, and why there is a reasonable probability that Michigan appellate courts would have found plain error had the issue been raised.  Etherton has therefore established that he was denied the right to effective assistance of counsel on his first appeal as of right.  Moreover, having considered the arguments raised by Rivard and relied on by the Michigan courts, we hold that it was an unreasonable application of clearly established Federal law for the Michigan court to hold otherwise.  Fairminded jurists could not disagree.  Etherton is therefore entitled to a belated appeal on the issue that counsel ineffectively failed to raise.

**B**

Next, we consider Etherton's argument that he was denied effective assistance of counsel on appeal as a result of appellate counsel's failure to argue ineffective assistance of trial counsel. He argues that appellate counsel should have raised three grounds for ineffective assistance of trial counsel: (1) that trial counsel should have objected to the admission of the content of the anonymous tip on Confrontation Clause grounds; (2) that trial counsel failed to object to improper explanations offered by the prosecution on closing argument; and (3) that defense counsel was unprepared for trial.

We agree with Etherton that appellate counsel should have argued that failure to object to the admission of the content of the anonymous tip constituted ineffective assistance of trial counsel.  Because there was a Confrontation Clause violation that resulted in substantial prejudice, there is a reasonable probability that Michigan appellate courts would have found trial

counsel constitutionally ineffective.  *See* Part III.A.3, *supra*.  The failure to include this compelling argument was therefore prejudicial and, in light of the less meritorious arguments raised on appeal, amounted to deficient performance of appellate counsel.  *See id.*  For the reasons stated above, we find that it was an unreasonable application of Federal law to hold otherwise.  Consequently, we hold that Etherton is also entitled to a belated appeal on this issue.

Etherton's second argument, however, is unpersuasive.  Minor improprieties in a prosecutor's closing argument can be corrected "by instructing the jury that closing arguments are not evidence."  *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011).  The trial court instructed the jury in this case that "[t]he lawyer[s'] statements and arguments are . . . not evidence."  (R. 5-4 at PageID 486.)  There was therefore no prejudice—and thus no ineffective assistance—due to trial counsel's failure to object to the closing argument.

Finally, Etherton's third argument is inconsistent with the record.  Appellate counsel in fact argued that trial counsel was ineffective as a result of being unprepared.  Accordingly, there was no ineffective assistance of counsel due to any *failure* to make such an argument.

## C

We now turn to the remaining three issues that Etherton argues should have been raised by his appellate counsel: (1) that the prosecutor improperly explained on closing argument why he had given a plea deal to the codefendant but not Etherton; (2) that the prosecutor acted improperly in closing argument by vouching for Pollie's credibility; and (3) that the prosecution elicited false testimony.  None of these arguments are persuasive.

First, as noted in Part III.B, *supra*, there was no prejudice as a result of the prosecution's explanations offered during closing argument.  Appellate counsel was therefore not ineffective in not raising it.

Second, for similar reasons, we find no ineffectiveness in appellate counsel's failure to argue that the prosecution improperly vouched for Pollie's credibility.  As the district court correctly noted, any comments that improperly bolstered Pollie's "were not extensive."  *Etherton*, 2014 WL 764843, at *10.  Any minor improprieties that may have resulted from the prosecution's comments as to Pollie's testimony were thus corrected by the trial court's jury

instructions that lawyers' statements are not evidence. Accordingly, appellate counsel was not ineffective in choosing not to argue this issue.

Finally, we find that appellate counsel was not ineffective in failing to argue that the prosecution introduced false testimony about the rate at which fingerprints are found on plastic bags. In order to establish a denial of due process as a result of the introduction of false testimony, a petitioner must show: "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Brooks v. Tennessee*, 626 F.3d 878, 894–95 (6th Cir. 2010) (quoting *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998)). Even assuming the evidence was material and false, Etherton has put forward no evidence or argument at any stage of the proceedings that the prosecution knew it was false. Etherton has therefore not established reasonable probability of success as to this argument, and his appellate counsel was thus not ineffective in failing to argue it.

**D**

Although Etherton has established a violation of clearly established federal law sufficient for relief under § 2254, that relief is circumscribed by the nature of the error and "AEDPA's purpose to further the principles of comity, finality, and federalism." *Williams v. Taylor*, 529 U.S. 420, 436 (2000). When a federal court grants a petition under § 2254 for ineffective assistance of appellate counsel, the petitioner is entitled only to have the opportunity for the state courts to review the merits of the claims that appellate counsel ineffectively failed to raise, consistent with the substantive and procedural rules of the state and the requirements of the United States Constitution. *See Mapes v. Tate*, 388 F.3d 187, 194 (6th Cir. 2004); *see also Payne v. Stansberry*, 760 F.3d 10, 18 (D.C. Cir. 2014); *Shaw v. Wilson*, 721 F.3d 908, 919 (7th Cir. 2013), *cert. denied sub nom. Brown v. Shaw*, 134 S. Ct. 2818, 189 L. Ed. 2d 785 (2014). "This remedy avoids unnecessarily interfering with [the State's] interest in correcting its own errors." *Mapes*, 388 F.3d at 194. Accordingly, we hold that Etherton is entitled to have Michigan courts consider the issues that, absent the ineffective assistance of appellate counsel, would have been raised on direct appeal.

**IV**

For the foregoing reasons, the judgment of the district court is **AFFIRMED IN PART** and **REVERSED IN PART**. The case is **REMANDED** with directions to issue a writ of habeas corpus unless, within whatever reasonable period of time the district court deems appropriate, Etherton is afforded a new appeal in which he may raise the Confrontation Clause and ineffective assistance of trial counsel arguments omitted from his original direct appeal or, in the alternative, is granted a new trial.

---

**DISSENT**

---

KETHLEDGE, Circuit Judge, dissenting.  The problem with the majority opinion is not that it misapplies the habeas standard, but that it fails to apply that standard at all.  The opinion nowhere gives deference to the state courts, nowhere explains why their application of *Strickland* was unreasonable rather than merely (in the majority's view) incorrect, and nowhere explains why fairminded jurists could view Etherton's claim only the same way the majority does.  The opinion, in other words, does exactly what the Supreme Court has repeatedly told us not to do.

I grant that one could argue the merits of Etherton's *Strickland* claim both ways, though personally I have a hard time seeing the putative prejudice upon which the majority rests its decision.  The issue at trial was whether the cocaine in Etherton's Audi belonged to him or to Pollie.  Had the tip taken a position on that issue—had it included, for example, some suggestion that Etherton purchased the cocaine before picking up Pollie—then Etherton would have had a solid argument as to prejudice.  But in fact the tip was agnostic as to whom the cocaine belonged:  it relayed only that two white men would be travelling down I-96 in a white Audi containing cocaine.  All of those facts were consistent with Etherton's defense.  All of them, indeed, were undisputed.  One may therefore ask why a "fairminded jurist," *Harrington v. Richter*, 562 U.S. 86, 102 (2011), could conclude *only* that the tip was so prejudicial that Etherton's counsel in state court was constitutionally required to make eight arguments on appeal rather than six.

The majority does not answer that question—its analysis sticks to *Strickland* rather than *Harrington*—but it does try to make out a case for prejudice *simpliciter*.  The argument boils down to this:  the tip was prejudicial precisely because all of the information contained in it was already common ground at trial.  Specifically, since all of the tip's information was undisputed at trial, and because Pollie's testimony included (among many other things) that same information, the tip tended to bolster Pollie's credibility at trial.  If Pollie was right about the color of the Audi and the interstate number and the fact that cocaine was in the car, the argument seems to go, maybe a juror would think he was right about who possessed the cocaine too.  That argument is

creative—in the sense that making do with the ingredients on hand is often creative—but it is hardly constitutionally required. Meanwhile, the cocaine was found in a driver's-door compartment only inches away from Etherton in a car that he owned and was driving at the time. That the cocaine was found under an empty bag of potato chips—as opposed to lying in plain view by the time the officers approached—does not help Etherton's case much. In short, a fairminded jurist could conclude, as the state court concluded, that Etherton had bigger problems at trial than the tip.

Too often in habeas cases the petitioner's brief, or an opinion granting the writ, read just like they would in a direct appeal. The court's opinion here illustrates the point. Respectfully, it takes more to apply the fairminded-jurist standard than to perform a direct-review analysis and then simply announce that "[f]airminded jurists could not disagree." Maj. Op. at 20. What it takes, rather, is a willingness to take seriously the arguments that supported or "could have supported" the state-court decision, *Harrington*, 562 U.S. at 102; and then to ask not merely whether we agree with those arguments, but whether they are coherent and grounded enough in the facts and applicable law that an unbiased jurist could agree with them. *See, e.g., Drummond v. Houk*, ___ F.3d ___, 2015 WL 4774940 at *2-3 (6th Cir. 2015). But we have none of that here.

In sum, the governing Supreme Court precedent in this case is not *Strickland* but *Harrington*. One passage in particular: "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington*, 562 U.S. at 105. Our decision today falls prey to that danger, and thus I respectfully dissent.