RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SHARI GUERTIN, individually and as next friend of her child, E.B., a minor; DIOGENES MUSE-CLEVELAND,

*Plaintiffs-Appellees*,

*v.*

STATE OF MICHIGAN, et al.,

*Defendants*,

Nos. 17-1699/1745

CITY OF FLINT, MICHIGAN, HOWARD CROFT, DARNELL EARLEY, and GERALD AMBROSE (17-1699); LIANE SHEKTER-SMITH, DANIEL WYANT, STEPHEN BUSCH, MICHAEL PRYSBY, and BRADLEY WURFEL (17-1745),

*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:16-cv-12412—Judith E. Levy, District Judge.

Decided and Filed:  May 16, 2019

Before:  McKEAGUE, GRIFFIN, and WHITE, Circuit Judges.

_____

## COUNSEL

**ON PETITION FOR REHEARING EN BANC:**  Frederick A. Berg, Jr., Sheldon H. Klein, BUTZEL LONG, P.C., Detroit, Michigan, Alexander S. Rusek, WHITE LAW PLLC, Okemos, Michigan, William Y. Kim, CITY OF FLINT, Flint, Michigan, Barry A. Wolf, LAW OFFICE OF BARRY A. WOLF PLLC, Flint, Michigan, for Appellants in 17-1699.  John J. Bursch, BURSCH LAW PLLC, Caledonia, Michigan, Philip A. Grashoff, Jr., KOTZ SANGSTER WYSOCKI P.C., Bloomfield Hills, Michigan, Thaddeus E. Morgan, Michael H. Perry, FRASER TREBILCOCK, Lansing, Michigan, Charles E. Barbieri, Allison M. Collins, FOSTER, SWIFT, COLLINS & SMITH, P.C., Lansing, Michigan, Jay M. Berger, Michael J. Pattwell, CLARK HILL PLC, Lansing, Michigan, for Appellants in 17-1745.  **ON RESPONSE:**  Steven Hart,

HART, MCLAUGHLIN & ELDRIDGE, LLC, Chicago, Illinois, John Sawin, SAWIN LAW FIRM, LTD., Chicago, Illinois, Paul T. Geske, MCGUIRE LAW, P.C., Chicago, Illinois, for Appellees. **ON BRIEF:** Samuel R. Bagenstos, Ann Arbor, Michigan, for Amici Curiae.

GIBBONS, J. (pg. 3), delivered a separate concurring opinion in which STRANCH, J., joined. SUTTON, J. (pp. 4–10), delivered a separate concurring opinion in which BUSH, J., joined. KETHLEDGE, J. (pp. 11–13), delivered a separate dissenting opinion in which THAPAR, LARSEN, NALBANDIAN, and MURPHY, JJ., joined.

———————————

**ORDER**

———————————

The court received petitions for rehearing en banc. The original panel has reviewed the petitions for rehearing and concludes that the issues raised in the petitions were fully considered upon the original submission and decision. The petitions then were circulated to the full court.[1] Less than a majority of the judges voted in favor of rehearing en banc.

Therefore, the petitions are denied.

---

[1]Judge Readler recused himself from participation in this decision.

———————————

## CONCURRENCE

———————————

GIBBONS, Circuit Judge, concurring in the denial of rehearing en banc. I write separately to note that at this stage in the proceeding, it is better to find out what facts will eventually be before the district court, rather than to prematurely attempt to determine what law would apply to those hypothetical facts. In reading the 89-page complaint, this court could find many iterations of possible allegations. As Judge Sutton notes, some of those possible allegations would not permit finding a constitutional violation. Still, others would permit such a finding.

When considering a 12(b)(6) motion to dismiss, it is not our job to find the facts. Our job is, and only is, to determine whether any possible allegation plausibly states a claim under which relief can be granted. To decide any other issue would be judicial overreach. To discuss anything further would be an advisory opinion. Both the majority and dissent rushed to articulate a standard before the facts had been fully discovered.

The plaintiffs, with whom every opinion expresses sympathy, are entitled to the full benefit of the rule's broad standard. That means that, so long as they have pled plausible allegations that would constitute a constitutional violation, they are entitled to discovery. The 12(b)(6) standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). We must "let district courts do what district courts do best—make factual findings—and steel ourselves to respect what they find." *Taglieri v. Monasky*, 907 F.3d 404, 408 (6th Cir. 2018) (en banc).

―――――――――――

**CONCURRENCE**

―――――――――――

SUTTON, Circuit Judge, concurring in the denial of rehearing en banc. If bad facts run the risk of making bad law, terrible facts run the risk of disfiguring law and silencing it altogether. In their complaint, the plaintiffs in this traumatic case plant the seeds of two potential stories. One speaks of local officials who bungled their response to a water crisis and in the process inadvertently polluted the water supply for the people of Flint, Michigan. The other speaks of local officials who intentionally poisoned Flint's water supply. In each telling, the claimants invoke the Due Process Clause of the Fourteenth Amendment. In each telling, the claimants invoke the most far-reaching and the least guide-posted permutation of that guarantee: substantive due process. And in each telling, the claimants seek hundreds of millions of dollars in retroactive money damages for the alleged constitutional violations.

Each story leads to a different end.

Negligent, even grossly negligent, conduct by local officials does not generally violate citizens' substantive due process rights. Least of all would these actions clearly violate such rights, as there is very little that is clear about substantive due process. If that's what happened here, this litigation needs to end—promptly. It is a distraction to the key goal (fixing Flint's water supply), and it is unfair to the public servants to boot. Their mistakes may deserve public criticism, but they do not deserve the tag of violating clearly established constitutional rights and what comes with it: exposure to crippling monetary judgments.

But an intentional or reckless effort to poison Flint's water supply is another matter. If that's what happened, the case must proceed.

So which account is the right account? It's too early to say. At the pleading stage of a case, plaintiffs are entitled to make plausible allegations in their complaint and use the discovery process to ferret out support for their preferred account through depositions, emails, and documents. At this early stage of the case, we must give the benefit of the doubt to the plaintiffs'

preferred theory of the case and allow the discovery process to determine whether plausible allegations in their complaint mature into fact-supported allegations.

In view of the starkly different nature of these two accounts and in view of the starkly different outcomes for each of them, I would have written the majority opinion—permitting this case to proceed to discovery—in a different key. At least five features of this unfortunate case warrant a tone of caution.

Cautionary feature one. This is a money damages case against public officials in their individual capacities. We do not lightly allow citizens to tap private pockets or the public treasury by suing the public officials that a majority of them selected to handle these jobs. That's why claimants must show that (1) the officials violated their constitutional rights and (2) the officials were on notice of the prohibition because they violated well-established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Only when the unconstitutionality of a local official's actions is "beyond debate," only when "every reasonable official would have understood that what he is doing violates that right," will we deny him protection. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quotation omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). That is a rigorous standard.

Cautionary feature two. Even when viewed in its best light, the plaintiffs' claim of unconstitutionality takes us to the outer edges of judicial competence. Unlike claims anchored in the U.S. Constitution's text, substantive due process cases offer little guidance about the reach of our authority, inviting a free-floating inquiry devoid of textual rhyme or reason. That's why we are directed to proceed slowly in this area "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of" any two judges on this court. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). And that's why the U.S. Supreme Court warns us that "the Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administered by the States." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) (quotation omitted).

But "a font of tort law" layered onto the state courts' remedial laws is just what we seem to be getting in this case. Our job is not to invoke highly abstract rights to facilitate money damages actions under § 1983 but to stoop to examine the details of the cases to make sure they plainly mark the lines of constitutional trespass and alert public officials to their metes and bounds. A comparison between this case and the bodily integrity cases invoked by the claimants shows a yawning gap. Sure, the U.S. Supreme Court has prohibited investigators from forcibly pumping a suspect's stomach to recover swallowed evidence, *Rochin v. California*, 342 U.S. 165, 172 (1952), has allowed a prisoner (in some cases) to forgo unwanted antipsychotic medication, *Washington v. Harper*, 494 U.S. 210, 221–22 (1990), and has assumed a right to refuse life-saving medical treatment, *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990).

But to describe these fact patterns is to question their applicability here. Not one of them involves the provision of a public utility in a time of economic hardship. Not one of these decisions, innovative at the time, involves a retroactive money damages action against public officials in their individual capacities. And all of them caution us to adopt the tenor of restraint when it comes to extending the right to bodily integrity in a new direction.

The precedent the panel majority found "especially analogous" to today's case, *Guertin v. Michigan*, 912 F.3d 907, 921 (6th Cir. 2019), has no business in the inquiry. It is a district court case. *See In re Cincinnati Radiation Litig.*, 874 F. Supp. 796 (S.D. Ohio 1995). And district court decisions do not mark appellate law—the relevant benchmark for ascertaining well-established constitutional law. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011); *Hall v. Sweet*, 666 F. App'x 469, 481 (6th Cir. 2016).

Cautionary feature three. Even aside from the one-off nature of these cases, the inscrutable nature of the inquiry by itself gives pause. While many acts of public officials might theoretically affect the right to bodily integrity, only an official who "shocks the conscience" violates the right. *Lewis*, 523 U.S. at 846. Missing from this case so far is any recognition that the purpose of the test is to restrain judges, not empower them; to remove claims from the constitutional arena, not to expand nebulous notions of substantive due process. *See id.* at 846–49. Also missing is an appreciation of the imperative that we not apply the "clearly established"

prong of qualified immunity at a nose-bleed level of generality, but rather must find precedent "particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017) (per curiam) (quotation omitted). Whatever else the shocks-the-conscience test means in the context of an effort to pierce public employees' qualified immunity, it at a minimum requires "an exact analysis of circumstances," *Lewis*, 523 U.S. at 850, measured by truly comparable cases. In the often "unfamiliar territory" that cases like this one present, "mechanical application" of prior precedent usually does little good. *Id.*

Cautionary feature four. All of this means that our court and the district court must carefully match allegations to individual defendants to determine whether the plaintiffs can show that each official engaged in conscience-shocking behavior—and clearly established behavior at that. Doubt clouds several aspects of the claims that remain in the case. By the plaintiffs' own account, the defendants relied on independent experts in making the most crucial decisions. How could that conduct show intentional misconduct—intentional poisoning of the people of Flint—given that the officials, aware of their own limitations, sought outside help? That does not sound like intentional or reckless behavior.

A like concern arises from the allegations against individual defendants still in the case. Take Darnell Earley as one example of this problem. He served as Flint's emergency manager from November 2013 until January 12, 2015. The complaint alleges that he "made the decision to switch to Flint River water," R. 1 at 7, then "forced the transition through" before Flint's treatment plant was ready in order to keep up with his "aggressive deadline," R. 1 at 21. He also allegedly made false and misleading statements that Flint's water was safe. But the complaint does not allege that he knew those statements were false. It instead says that the government hired an outside engineering firm to make sure the city properly treated the water. Those experts did not recommend that the city set water quality standards or implement corrosion control before using the river's water. And the first report of lead in Flint's drinking water did not come until January 9, 2015. That's only four days before Gerald Ambrose replaced Earley as the emergency manager and around the same time that officials employed a second outside engineering firm to investigate complaints. (That firm also concluded that the water was safe.) I struggle to see how Earley's actions, all consistent with outside experts' advice, rise to the

threshold of a clearly established substantive due process violation. The same may be true of other individual defendants.

Cautionary feature five. A similar case already exists in state court. Based on the same events, several individuals filed a putative class action in the Michigan courts against most of the same defendants under the substantive due process guarantee of the Michigan Constitution. *See Mays v. Snyder*, 916 N.W.2d 227, 240, 242 (Mich. Ct. App. 2018). The Michigan Court of Appeals denied the defendants' motions for summary disposition as to the state law due process bodily integrity claims, and that case continues to wind its way through the Michigan court system. *Id.* at 242–43, 277.

Would it not make sense for the federal courts to wait and see what relief the Michigan Constitution provides before determining whether the state defendants violated the Due Process Clause of the U.S. Constitution? Before deciding whether someone may sue a State for depriving him of property or liberty or life without due process, the federal courts first consider the judicial process the State provides him to remedy his alleged injuries. *Parratt v. Taylor*, 451 U.S. 527, 543–44 (1981); *see Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Albright v. Oliver*, 510 U.S. 266, 283–86 (1994) (Kennedy, J., concurring in the judgment). For that reason, if the underlying state and federal claims in today's case turned on process in its conventional sense, the federal courts presumably would stay their hand to determine what process the State provided. If that approach makes sense in the context of *procedural* due process, it makes doubly good sense in the context of *substantive* due process. Otherwise, we give claimants more leeway when they raise the most inventive of the two claims, rewarding them for asking us to do more of what we should be doing less.

This is not a new concept. For some time, the federal courts have tried to avoid federal constitutional questions when they can. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341 (1936) (Brandeis, J., concurring). One way to further that goal is to learn whether the substantive due process protections of the Michigan Constitution or any other state laws redress the plaintiffs' injuries. Because the "open-ended" nature of substantive due process claims lacks "guideposts for responsible decisionmaking," *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992), we should welcome input from the Michigan courts about what process, substantive

or otherwise, is due under state law. Better under these circumstances, it seems to me, to hold the federal substantive due process claims in abeyance—and avoid prematurely creating new federal constitutional tort regimes—until the plaintiffs have had a chance to vindicate their rights in state court. *Cf. Browder v. City of Albuquerque*, 787 F.3d 1076, 1083–85 (10th Cir. 2015) (Gorsuch, J., concurring).

All of this by the way will prove beneficial whether the plaintiffs win or lose in state court. If they win, there will be less, perhaps nothing at all, for the federal courts to remedy under federal substantive due process. If they lose, the state courts' explanation may inform the federal claims.

Having urged our court and the district court to address these claims with caution and restraint, I must accept a dose of my own medicine. Two features of this case offer some support for these decisions—sufficient support to wait and see before granting a petition to review the case as a full court. One reasonable explanation for waiting to review the dispute is the stage of the case—Rule 12(b)(6)—from which these decisions arose. This is not a barebones complaint based on implausible allegations. It comes in at 89 pages. And it offers plenty of details that at least plausibly allege public acts of recklessness and intentional misbehavior. The point of discovery is to allow claimants and the courts to determine whether facts support plausible claims. That opportunity should help us all in resolving this case fairly.

A second reasonable explanation for waiting to review this case as a full court is the hard-to-pin-down nature of the clearly established inquiry. The officials, it is true, can be found liable only if this lawsuit falls into the narrow category of cases so egregious, so obvious, that *all* reasonable officials *must* have known what they did was wrong. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). What's tricky is figuring out what counts as reckless or intentional behavior—in the context of a clearly established conscience-shocking standard of care. For better or worse, the case law seems to present a sliding scale—the more evidence of unforgiveable intent, the less necessity to identify a case just like this one. That is what seemed to happen in *Hope v. Pelzer*. The facts were unique. No correctional officials before then, at least in a litigated case, had thought to chain inmates to a hitching post in the unrelenting heat of the Alabama sun for seven hours as a form of prison discipline. What permitted the U.S. Supreme Court to hold that the

state officials violated clearly established norms turned not on any one precedent but on the egregiousness of the state officials' state of mind. *Id.* at 741, 745. So long as that is an appropriate approach to qualified immunity claims, it would seem that allegations like these—intentional or reckless poisoning of citizens—plausibly clear the clearly established hurdle and warrant discovery. *See Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015); *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 774–76 (7th Cir. 2000) (Easterbrook, J., concurring in part and concurring in the judgment).

That discovery should proceed does not eliminate a role for the district court. One would hope that the court, in view of the seriousness of the allegations and the potential protections of qualified immunity at summary judgment, would not deploy a laissez-faire approach to document and deposition discovery. Carefully tailored and prompt discovery should answer whether the intentional and reckless poisoning allegations hold up. If not, this case needs to return to the court of public opinion, where one suspects it should have remained all along.

_____

**DISSENT**

_____

KETHLEDGE, Circuit Judge, dissenting from the denial of rehearing en banc. To state the obvious, the sympathies of every decent person run entirely to the plaintiffs in this case. But sometimes the law, evenhandedly applied, leads to a result contrary to the crush of popular opinion. This is one of those cases.

Respectfully, the majority's decision on the issue of qualified immunity is barely colorable. To overcome qualified immunity, the plaintiffs must show that "existing law" made not merely the legality, but "the *constitutionality* of the [state] officer's conduct 'beyond debate.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018) (emphasis added) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Here, the putative constitutional violation concerns the vaguest of constitutional doctrines, namely substantive due process. The doctrine purports to protect—"specifically," no less—"those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Maj. Op. at 6-7 (quoting *Washington v. Glucksberg*, 512 U.S. 702, 720-21 (1997)). That formulation (along with any number of alternative ones) is more oratory than legal rule, which has made the doctrine malleable enough to generate an array of constitutional rights over the years. Those include, to cite only a handful: the right to work unlimited hours in a bakery, *Lochner v. New York*, 198 U.S. 45, 53 (1905); the right to procreate, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942); the right to charge certain minimum railroad rates, *Ex parte Young*, 209 U.S. 123, 149 (1908); the right to teach schoolchildren in German, *Meyer v. Nebraska*, 262 U.S. 390, 403 (1923); and the right not to pay "grossly excessive" punitive damages, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996).

But just as crowbars are not made out of tin, substantive due process's easy malleability makes it a notably poor instrument for prying away an officer's qualified immunity. For to overcome that immunity in a case (like this one) where the claim is constitutional, the "contours" of the relevant constitutional rule "must be so well defined that it is 'clear to a reasonable

officer'" that his conduct would violate the rule. *Wesby*, 138 S.Ct. at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). That requirement—often repeated by the Supreme Court, but sometimes, as here, overlooked—presents two obstacles to the majority's decision in this case. The first concerns the particular "fundamental right" (or rule) that the majority relies upon, namely a "right to bodily integrity[.]" Maj. Op. at 7. The sheer vagueness of that formulation illustrates that its "contours" are shapeless rather than crisp, subjective rather than objective, unknowable until judicially announced. Even the majority acknowledges (as it stretches the right further) that the right presents "far from a categorical rule." Maj. Op. at 8.

The second problem is related: the "bodily integrity" caselaw fails to provide the "high 'degree of specificity[,]'" *Wesby*, 138 S.Ct. at 590 (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 309 (2015) (per curiam)), necessary to overcome qualified immunity, at least as to the claim here. Instead that caselaw for the most part provides a handful of data points, which form more of a dusty nimbus than a planetary ring. But the caselaw does reveal a *sine qua non* for the right's violation: that the officer's invasion of the plaintiff's bodily integrity be *intentional*. To cite the majority's own examples: the right protects against "forcible injection" of "antipsychotic medication[,]" *Washington v. Harper*, 494 U.S. 210, 220-21, 229 (1990); against forcible stomach-pumping, *Rochin v. California*, 342 U.S. 165, 172 (1952); and, in a district court case, against conducting medical experiments upon cancer patients without their consent, *In re Cincinnati Radiation Litigation*, 874 F.Supp. 796, 803 (S.D.Ohio 1995). Nobody forcibly injects or stomach-pumps or conducts medical experiments upon another person by accident. Yet the claim at issue here, as the plaintiffs themselves make it, indisputably sounds in negligence: that "Defendants violated Plaintiffs' rights to bodily integrity, insofar as Defendants failed to protect Plaintiffs from *a foreseeable risk of harm*"—the classic formulation, as any first-year law student knows, of a negligence claim—from "exposure to lead contaminated water." Compl. ¶ 384 (emphasis added). And even the majority concedes that "[t]here is no allegation defendants intended to harm Flint residents." Maj. Op. at 18. Thus, the only manner in which the majority's "examples illustrate the breadth" of the right to bodily integrity, Maj. Op. at 9, is to show that the right is inapposite here.

What the majority opinion does, in response, is simple: it changes the level of generality at which it describes the putative right, until the description is general enough to reach the plaintiffs' allegations of negligence. Specifically, what the court first describes as a "constitutional right [of persons] to be free from *forcible intrusions on their bodies against their will*," Maj. Op. at 9 (emphasis added), on the next page becomes a sweeping right of "nonconsenting individuals" to be free of "foreign substances with no known therapeutic value[,]" Maj. Op. at 10—in short, a constitutional right to be free of unwanted substances. That putative right is violated every day, indeed every time that virtually any of us takes a breath. But more to the point, the majority's formulation elides what the prior cases require—namely that the officer's injection or intrusion of the "foreign substance" into the plaintiff's body be intentional.

No official—no matter how blameworthy he might be on moral grounds—can be expected to recognize in advance that a court will recast a legal rule so that it applies to conduct to which it has never applied before. That in part is why the Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality[.]'" *Wesby*, 138 S.Ct. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Yet that is precisely what our court's opinion does here. The Supreme Court has also repeatedly said that courts must not turn substantive due process into "a font of tort law to be superimposed upon whatever systems may already be administered by the States[.]" *Daniels v. Williams*, 474 U.S. 327, 332 (1986) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)). Yet our court's opinion does that too, by expanding substantive due process to reach claims based on negligence rather than intent. Our court's opinion, "in other words, does exactly what the Supreme Court has repeatedly told us not to do." *Etherton v. Rivard*, 800 F.3d 737, 757 (6th Cir. 2015) (dissenting opinion), *rev'd sub nom. Woods v. Etherton*, 136 S.Ct. 1149 (2016) (per curiam).

I respectfully dissent from the order denying rehearing en banc.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk