RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0257p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

OPAWL—BUILDING AAPI FEMINIST LEADERSHIP;
NORTHEAST OHIO COALITION FOR THE HOMELESS;
ELISA BREDENDIEK; PETER QUILLIGAN; JOHN
GERRATH,

    *Plaintiffs-Appellees/Cross-Appellants*,

  *v.*

DAVE YOST, in his official capacity as Ohio Attorney
General; FRANK LAROSE, in his official capacity as
Ohio Secretary of State,

    *Defendants-Appellants/Cross-Appellees*.

> Nos. 24-3768/3818

─────────────

United States District Court for the Southern District of Ohio at Columbus.
No. 2:24-cv-03495—Michael H. Watson, District Judge.

Argued:  July 23, 2025

Decided and Filed:  September 16, 2025

Before:  KETHLEDGE, MURPHY, and MATHIS, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Mathura J. Sridharan, OFFICE OF THE OHIO ATTORNEY, GENERAL, Columbus, Ohio, for Dave Yost and Frank LaRose.  Elisabeth C. Frost, ELIAS LAW GROUP LLP, Washington, D.C., for OPAWL, et al.  Jason Walta, NATIONAL EDUCATION ASSOCIATION, Washington, D.C., for Amicus Curiae. **ON BRIEF:**  T. Elliot Gaiser, Michael J. Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Dave Yost and Frank LaRose.  Elisabeth C. Frost, Jyoti Jasrasaria, Melinda K. Johnson, ELIAS LAW GROUP LLP, Washington, D.C., C. Benjamin Cooper, Kaela King, COOPER ELLIOTT, Columbus, Ohio, for OPAWL, et al.  Jason Walta, Philip A. Hostak, NATIONAL EDUCATION ASSOCIATION, Washington, D.C., Nathan Johnson, THE OHIO ENVIRONMENTAL COUNCIL, Columbus, Ohio, for Amici Curiae.

The court delivered a PER CURIAM opinion.  KETHLEDGE and MURPHY, JJ. (pp. 4–10), delivered a separate concurring opinion.  MATHIS, J. (pp. 11–19), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

PER CURIAM.  In 2024, the Ohio legislature passed a law that banned foreign nationals from contributing to candidates in state elections and from spending money to support or oppose state ballot initiatives.  *See* Ohio Rev. Code § 3517.121.  The plaintiffs here brought this suit, claiming on various grounds that the law violates the constitutional rights of lawful permanent residents.  Thereafter the plaintiffs moved for a preliminary injunction, which the district court granted on the ground that the plaintiffs were likely to prevail on one of their First Amendment claims.  That injunction barred enforcement of the law against not only lawful permanent residents, but also against any individual who is a "foreign national."

The Ohio Attorney General appealed and moved for a stay of the district court's injunction.  After briefing on the stay motion, a divided panel granted the state's motion in a published opinion that (including the dissent) ran some 24 pages.  *See OPAWL v. Yost*, 118 F.4th 770 (6th Cir. 2024).  In that opinion, the court held that the plaintiffs were unlikely to succeed on their claim that the First Amendment did not permit states to ban political expenditures and contributions by lawful permanent residents.  *See id.* at 775–76.  The parties and an amicus then filed merits briefing in this preliminary-injunction appeal.

We have ourselves now carefully reviewed all the relevant materials, including the relevant cases.  For substantially the reasons stated in the stay panel's majority opinion, two of us conclude that Ohio is likely to prevail on the plaintiffs' First Amendment claims.  *See id.* at 774–86.  And we see little purpose in rehearsing those reasons in what would turn out to be essentially an identical opinion here.

The plaintiffs raise several issues in a cross-appeal.  They argue, for instance, that the ban on electioneering communications by lawful permanent residents violates the Equal Protection

Clause.  But that claim is largely derivative of their First Amendment claim—and likely fails for the same reasons.  *See First Choice Chiropractic v. DeWine*, 969 F.3d 675, 684–85 (6th Cir. 2020).  Specifically, as the stay panel held, Ohio's law is narrowly tailored to serve a compelling interest.  *See OPAWL*, 118 F.4th at 785. The plaintiffs' equal-protection claim is likely to fail, therefore, regardless of the degree of scrutiny that we would apply.

The plaintiffs otherwise argue that Ohio's ban on ballot-issue spending (as compared to spending on political candidates) by all foreign nationals violates the First Amendment.  The plaintiffs further argue that § 3517.121 is void for vagueness.  The district court has not yet addressed the vagueness argument; and though it might have addressed the argument about ballot-issue spending, *OPAWL v. Yost*, 747 F. Supp. 3d 1065, 1084–86 (S.D. Ohio 2024), the Ohio Attorney General contends that we should leave these issues to the district court on remand. We agree.

We therefore reverse the district court's order granting the injunction, and remand for further proceedings consistent with this opinion and with that of the majority on the stay panel— given our substantial adherence to that opinion here.

---

**CONCURRENCE**

---

KETHLEDGE and MURPHY, Circuit Judges, concurring.  The majority and dissent at the stay stage of this appeal made thoughtful arguments about why (or why not) Ohio's ban on political spending by lawful permanent residents satisfied the Supreme Court's policy-laden approach to the First Amendment's Free Speech Clause.  *Compare OPAWL v. Yost*, 118 F.4th 770, 776–85 (6th Cir. 2025), *with id.* at 788–93 (Davis, J., dissenting).  We would add little merely to rehash the competing policy concerns a second time.  Frankly, the Supreme Court's current precedent over how to engage in the relevant "weighing" leaves us unsure that a clearly right or wrong legal answer exists on this policy question.  At the same time, to the extent the Constitution's original meaning should matter for resolving this doubt, its answer is unambiguous.  We write to explain this uncertainty as a matter of precedent and clarity as a matter of original meaning.

The Court has adopted the same "strict scrutiny" test for several different rights, including the Free Speech Clause, the Free Exercise Clause, and the Equal Protection Clause.  *See, e.g.*, *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2310 (2025); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206–07 (2023); *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).  Although it has articulated this test in different ways, it has generally explained that a law will not survive strict scrutiny unless the law furthers "a compelling state interest by the least restrictive means available."  *Bernal v. Fainter*, 467 U.S. 216, 219 (1984).

Despite the test's uniform requirements in theory, the Court has seemed to apply both a rigorous version and a watered-down version of strict scrutiny in practice.  Many data points illustrate this divide.  Start with the basic way the Supreme Court has described strict scrutiny over the years.  When the Court has relied on that test to find a law unconstitutional, it has suggested that "strict-scrutiny review is 'strict' in theory but usually 'fatal' in fact."  *Id.* at 219 n.6 (citation omitted).  And when the Court has refused to apply strict scrutiny for fear that the

test would bar state actions long presumed constitutional, it has made similar statements: that strict scrutiny "is fatal in fact absent truly extraordinary circumstances." *Free Speech Coal.*, 145 S. Ct. at 2310. But when the Court has upheld laws under strict scrutiny, it has made the opposite assertion: that "[s]trict scrutiny is *not* 'strict in theory, but fatal in fact.'" *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 237 (1995)) (emphasis added); *see Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015).

Or consider the Court's application of the "compelling interest" part of strict scrutiny. When the Court finds that a law passes strict scrutiny, it sometimes allows the government to identify this interest at a high level of generality. In *Williams-Yulee*, for example, the Court upheld a state law banning judges from soliciting campaign donations based on the general interest in "preserving public confidence in the integrity of the judiciary[.]" 575 U.S. at 444. The Court did not require the state to prove a compelling interest in the *marginal* increase in "public confidence" achieved through this ban apart from the state's other judicial-conduct regulations. When, by contrast, the Court finds that a law flunks strict scrutiny, it refuses to articulate the interest at a "high level of generality[.]" *Fulton*, 593 U.S. at 541. Rather, it "demands a more precise analysis." *Id.* Take the Court's decision to find unconstitutional a state law barring the sale of violent video games to children. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 789, 805 (2011). In that case, the state invoked a general interest in ensuring "parental authority" over their children's video-game usage. *Id.* at 802. But other laws already helped parents "control" that usage. *Id.* at 803. So the Court asked whether the state had a compelling interest in the new law's "modest" *extra* protections. *Id.* And it held that this interest fell short because a state "does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9. Why does a general interest suffice in some cases but not in others?

Likewise, the Court's cases diverge on the evidence that the government must produce to satisfy strict scrutiny. When the Court upholds a law, it typically allows the government to rely on "intuiti[on]" that the law advances a compelling interest. *Williams-Yulee*, 575 U.S. at 445. The Court thus relied on "common sense" (not record evidence) to hold that a state may ban political displays in and around polling places to prevent voter intimidation and ensure reliable

elections. *Burson v. Freeman*, 504 U.S. 191, 198–99, 207–08 (1992) (plurality opinion). When the Court finds a law unconstitutional, by contrast, it sometimes criticizes the government for relying on this sort of intuition. The federal government, for example, defended the Stolen Valor Act (which prohibited people from lying about winning military awards) based on the "common sense" notion that the broad proliferation of false claims would "dilute the value" of these awards. *United States v. Alvarez*, 567 U.S. 709, 726 (2012) (plurality opinion) (citation omitted). But the Court explained that the government should have presented "evidence" that the false statements had the claimed effect on the public mind. *Id.* As a result, when may the government rely on lawyer's arguments and when must it present "proof by documentary record"? *Williams-Yulee*, 575 U.S. at 447.

The Court's treatment of "underinclusive" laws reveals the same tension. *Brown*, 564 U.S. at 802. These laws ban certain speech to further a governmental interest but permit other speech that seems to harm that interest in a similar way. *See Williams-Yulee*, 575 U.S. at 448–49. When the Court finds strict scrutiny met, it downplays these underinclusiveness concerns on the ground that governments may "focus on their most pressing concerns" without addressing "all aspects of a problem" at once. *Id.* at 449. In *Williams-Yulee*, then, the Court upheld the state ban on a judge's request for money even though the state allowed other people to ask for money on the judge's behalf and even though the judge could write thank-you notes to donors. *Id.* at 449–51. The Court reached this result seemingly through deferential reasonableness review. It found that a state could "reasonably" believe that personal judicial solicitations posed "categorically different" risks to the public's confidence in the judiciary than the permissible expression. *Id.* at 449. When the Court holds that a law fails strict scrutiny, by contrast, it shows no similar solicitude to the government. In *Brown*, it thus found unconstitutional the ban on the sale of violent video games to minors because it was "wildly underinclusive" in that the state did not also ban children from reading violent books or watching violent cartoons. 564 U.S. at 801–02. In the process, it rejected the state's (ostensibly reasonable) claim that graphic video games were categorically different from, say, a "Bugs Bunny" cartoon. *See id.* at 798–802; *cf. id.* at 806 (Alito, J., concurring in the judgment). So when should courts evaluate a law's

underinclusiveness merely for reasonableness and when should they review that underinclusiveness with more vigor?

In fairness to the Court, these conflicts are likely unavoidable given the nature of the inquiry. The approach that the Justices have inherited requires them to make "free-wheeling policy judgments" more suited for legislators than judges. *Nat'l Republican Senatorial Comm. v. FEC*, 117 F.4th 389, 400 (6th Cir. 2024) (en banc) (Thapar, J., concurring). Whether some governmental interest is "compelling" as a policy matter and whether some law is sufficiently (if not perfectly) "tailored" to advance that interest will often depend on value judgments as to which many Americans will disagree. The proper result thus will ultimately be "in the eye of the beholder." *McDonald v. City of Chicago*, 561 U.S. 742, 802–03 (2010) (Scalia, J., concurring). And the doctrine will inevitably produce divergent results across cases by those attempting to apply it in all good faith.

In sum, we find this case difficult because it is unclear whether we should apply the relaxed or rigorous version of strict scrutiny. And the difference may well matter to the constitutionality of Ohio's ban on political spending by lawful permanent residents. *See* Ohio Rev. Code § 3517.121(A)(2)(a), (B)(1)–(2). Ohio's Attorney General, for example, has articulated Ohio's interests at a high level of generality, claiming that the state has a "compelling interest in excluding foreign money from [Ohio] elections." Appellant's Br. 21 (citing *Bluman v. FEC*, 800 F. Supp. 2d 281, 290 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012)). Yet this framing does not consider whether Ohio also has a compelling interest in barring lawful permanent residents (as compared to illegal immigrants or foreign governments) from this spending. Similarly, the Attorney General presents little "proof" to establish that Ohio's ban furthers its interest. *Williams-Yulee*, 575 U.S. at 447. He instead relies on the "common sense" claim that lawful permanent residents are noncitizens and so their spending counts as the type of "foreign influence" that Ohio may stop. *See Burson*, 504 U.S. at 207–08 (plurality opinion). The Ohio Attorney General also asserts that the Ohio law does not have an underinclusiveness problem even though it permits domestic corporations with *foreign owners* to spend corporate money on elections but bars domestic nonprofit entities from spending *foreign donations* received from lawful permanent residents. Ohio's legislature could "reasonably" distinguish

these entities because nonprofits can segregate these donations in a way that domestic corporations cannot segregate a foreign owner's ownership interests. *Williams-Yulee*, 575 U.S. at 448–50; *see OPAWL*, 118 F.4th at 785 n.5. But would this distinction suffice under *Brown*'s more searching underinclusiveness review?

In the end, only the Supreme Court can answer which version of strict scrutiny applies. But we agree with the stay panel majority that this case resembles those in which the Court has applied the relaxed version (such as *Williams-Yulee*) more than those in which it has applied the rigorous one (such as *Brown*). *See OPAWL*, 118 F.4th at 777, 781–82. For one thing, the "concept" of foreign influence in an election (like the concept of public confidence in the judiciary) "does not easily reduce to precise definition" or "lend itself to proof by documentary record." *Williams-Yulee*, 575 U.S. at 447. Yet all judges and parties here have agreed (at least at an abstract level) that Ohio has a "genuine and compelling" interest in preventing this type of influence. *Id.* Next, just as "all personal solicitations by judicial candidates create a public appearance that undermines confidence in the integrity of the judiciary," *id.* at 454, so too all monetary spending by foreign nationals creates the public appearance of foreign influence in elections. As a result, banning all spending by foreign nationals "is narrowly tailored to address" the one problem in the same way that "banning all personal solicitations by judicial candidates is narrowly tailored to address" the other one. *Id.* In short, as long as the binding holding from *Williams-Yulee* remains good law, its analysis would seem to apply in full here: a near perfect match exists between the means (barring foreign spending) and the ends (stopping foreign influence).

For another thing, Ohio's law targets certain individuals primarily because of their "special characteristics"—their *foreign status*—not because of their speech's *content*. *TikTok Inc. v. Garland*, 604 U.S. 56, 72–73 (2025) (per curiam) (citation omitted). The Court has reviewed laws that engage in that type of speaker discrimination more deferentially than laws that target a speaker because of the message. *See id.* And the Court's equal-protection precedent reinforces that idea. It has generally applied "strict judicial scrutiny" to state laws that discriminate against lawful permanent residents. *Bernal*, 467 U.S. at 219. But the Court has long excepted from this rigorous review laws that permit only citizens to participate in a state's

"basic governmental processes" because judicial interference in that domain would upset "those aspects of democratic self-government that are most essential to it." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439–40 (1982). So the Court has allowed states to bar lawful permanent residents from serving as public teachers, *see Ambach v. Norwick*, 441 U.S. 68, 80–81 (1979), or police officers, *Foley v. Connelie*, 435 U.S. 291, 299–300 (1978). And participating in an election campaign for a state's officers or its laws sits much more at the heart of "democratic self-government" than, say, teaching a high-school math class. *Cabell*, 454 U.S. at 440.

Finally, while the Court's strict-scrutiny caselaw renders the answer difficult, the Constitution's original meaning would make it easier. The Fourteenth Amendment's Privileges or Immunities Clause provides that no state "shall abridge the privileges or immunities of citizens of the United States[.]" U.S. Const. amend. XIV, § 1. Soon after the Amendment's ratification, however, the Supreme Court rendered that Clause nearly a dead letter. *See, e.g.*, *United States v. Cruikshank*, 92 U.S. 542, 551–53 (1876). Since then—by means of "substantive due process," a doctrine that first appeared in *Dred Scott v. Sanford*, 60 U.S. 393, 450 (1857)—the Court has employed the Fourteenth Amendment's Due Process Clause to "incorporate" against the states most of the rights in the First through Eighth Amendments. Thus, a guarantee that had been understood for centuries to be procedural, was deemed eventually to encompass nearly all the substance of the Bill of Rights. *See Timbs v. Indiana*, 586 U.S. 146, 150 (2019); *see also McDonald*, 561 U.S. at 809–10 (Thomas, J., concurring in part and concurring in the judgment).

Yet nearly every scholar of the Fourteenth Amendment—from Barnett to Lash to Lessig—agrees that "the privileges or immunities of citizens of the United States[,]" as used in § 1 of that Amendment, included the rights expressly enumerated in the 1791 Constitution. *See* Randy Barnett & Evan Bernick, *The Original Meaning of the 14th Amendment* 206–25 (2021); Kurt Lash, *The Fourteenth Amendment and the Privileges and Immunities of American Citizenship* 279–80 (2014); Lawrence Lessig, *The Brilliance in Slaughterhouse: A Judicially Restrained and Original Understanding of "Privileges or Immunities,"* 26 Penn. J. Con. Law 1, 28 (2024). The Amendment's framers—namely postwar congressional Republicans—certainly seemed to think as much. *See, e.g.*, *McDonald*, 561 U.S. at 826–35 (Thomas, J., concurring in

part and concurring in the judgment); Barnett & Bernick, *supra*, at 128–43; Lash, *supra*, at 174–75. So, by all appearances, the Privileges or Immunities Clause is the right ground upon which to enforce the rights enumerated in the 1791 Constitution against the states. And that ground—unlike substantive due process—does not arrogate to the courts a power that has proven both legislative in character and utterly arbitrary in practice. *See, e.g.*, *Guertin v. Michigan*, 924 F.3d 309, 315–16 (6th Cir. 2019) (en banc) (Kethledge, J., dissenting).

This case is one where the delta between "incorporation" and the Privileges or Immunities Clause makes a real difference—if not to the outcome, then at least to the analysis. For application of the Clause would make our analysis straightforward. The term "citizens," as used in that Clause, stands in contrast to the word "person" as used later in the Due Process and Equal Protection Clauses. Plainly, then, the Privileges or Immunities Clause bars the states from abridging the privileges or immunities only of "citizens." And here the Ohio statute applies only to noncitizens. Hence that statute does not violate the Clause. So far as the plaintiffs claim that the Ohio statute violates their freedom of speech, therefore, application of the Privileges or Immunities Clause would all but compel reversal of the district court's injunction here.

———————————

**DISSENT**

———————————

MATHIS, Circuit Judge, dissenting.   As of September 2024, Ohio had about 160,000 lawful permanent residents living there.[1]   About 90,000 of those individuals were eligible to become U.S. citizens.  That same month, Ohio enacted a law barring lawful permanent residents in Ohio and throughout the country (and other noncitizens) from using their money to "speak" about Ohio elections.  This law tramples on the First Amendment free-speech rights of lawful permanent residents.  And so the plaintiffs should succeed on their First Amendment challenge to the law.

The majority sees this case otherwise.  Its opinion adopts the rationale of the motions-panel decision in *OPAWL — Building AAPI Feminist Leadership v. Yost*, 118 F.4th 770 (6th Cir. 2024), which concluded that an Ohio law barring all noncitizens, including lawful permanent residents, from making political contributions and expenditures for political candidates for elective office in Ohio and statewide ballot initiatives likely does not violate the First Amendment.  I respectfully dissent.

**I.**

In 2024, the Ohio legislature passed Ohio Revised Code § 3517.121, which modified Ohio's Campaign Finance Law.  Section 121 makes it a crime for a "foreign national" to "directly or indirectly":

> (1) Make a contribution, expenditure, or independent expenditure in support of or opposition to a candidate for any elective office in this state, including an office of a political party;

> (2) Make a contribution, expenditure, or independent expenditure in support of or opposition to a statewide ballot issue or question, regardless of whether the ballot issue or question has yet been certified to appear on the ballot;

———————————

[1]Sarah Miller, Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2024 and Revised 2023, U.S. Dep't of Homeland Sec. 5 tbl. 3 (Sept. 2024), https://perma.cc/D6J6-MK9W.

(3) Make a disbursement for the direct cost of producing or airing an electioneering communication;

(4) Make a contribution to a candidate, campaign committee, political action committee, political contributing entity, legislative campaign fund, state candidate fund, political party, or separate segregated fund, to any committee created to support or oppose a ballot issue or question, or, to the maximum extent permitted by law and by the constitutions of the United States and of this state, to a continuing association;

(5) Promise, either expressly or implicitly, to make a contribution, expenditure, independent expenditure, or disbursement described in division (B)(1), (2), (3), or (4) of this section.

Ohio Rev. Code Ann. § 3517.121(B), (F).   The law also bars any "individual, candidate, campaign committee, political action committee, political contributing entity, legislative campaign fund, state candidate fund, political party, separate segregated fund, . . . committee created to support or oppose a ballot issue or question[,] and . . . continuing association" from accepting funds from a foreign national for any purpose mentioned in subsection B(1)–(5) or from making a political contribution or expenditure with funds received from a foreign national. *Id.* § 3517.121(C).   A "foreign national" includes any "individual who is not a United States citizen or national." *Id.* § 3517.121(A)(2)(a).

Ohio's definition of "foreign national" therefore captures lawful permanent residents of the United States.  Lawful permanent residents are those individuals who "hav[e] been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws."  8 U.S.C. § 1101(a)(20).

"Lawful permanent residents have a long-term stake in the flourishing of American society." *Bluman v. FEC*, 800 F. Supp. 2d 281, 291 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012).  So they are "viewed as more similar to citizens than they are to temporary visitors." *Id.*  This gives lawful permanent residents a distinct status among noncitizens to enjoy certain privileges, protections, and responsibilities.  They serve in the United States military, they pay taxes, and they do not have to fill out additional paperwork to gain lawful employment. *Id.*; *OPAWL*, 118 F.4th at 789 (Davis, J., dissenting).  And many are on the path to full citizenship.

Lawful permanent residents also enjoy constitutional protections. "Once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders." *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring) (citation modified); *accord United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). Pertinent here, lawful permanent residents enjoy a First Amendment right to free speech. *Bridges*, 326 U.S. at 148 (majority opinion).

## II.

The plaintiffs (two lawful permanent residents, a United States citizen married to a lawful permanent resident, and two Ohio nonprofits) were entitled to a preliminary injunction. Parties seeking a preliminary injunction must show: (1) a likelihood of success on the merits, (2) irreparable harm if an injunction is not granted, (3) that the "balance of equities" tips in their favor, and (4) that an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Appellate courts review a district court's decision to grant a preliminary injunction for an abuse of discretion. *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam). This case turns on whether the plaintiffs satisfied the likelihood-of-success prong.

Under the First Amendment, as applied to the States through the Fourteenth Amendment, a State "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I; *Grosjean v. Am. Press Co.*, 297 U.S. 233, 243 (1936). Of course, not all speech is protected, and the freedom of speech is not unlimited. "To determine whether a law that regulates speech violates the First Amendment," courts consider "the nature of the burden imposed by the law and the nature of the speech at issue." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2302 (2025). If the speech at issue is protected, then "the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784–85 (1978).

The First Amendment generally protects political speech by subjecting laws that regulate it to heightened scrutiny. Political expenditure limits and contribution limits have been traditionally subject to different levels of First Amendment scrutiny. *McCutcheon v. FEC*, 572

U.S. 185, 196–97 (2014) (plurality opinion).  Expenditure limits receive strict, or exacting, scrutiny.  *Id.*  Contribution limits receive heightened intermediate, or closely drawn, scrutiny.  *Id.*

In this case, no one disputes several important points.  *One*, Section 121 regulates protected speech.  Limitations on political contributions and expenditures "operate in an area of the most fundamental First Amendment activities."  *Id.* at 196 (quotation omitted).  *Two*, lawful permanent residents have First Amendment free-speech rights.  *Bridges*, 326 U.S. at 148.  *Three*, Section 121 bars lawful permanent residents (and other noncitizens) from speaking through political contributions and expenditures in Ohio political campaigns.

**A.**

*Expenditure Ban*.  The motions panel assumed that strict scrutiny applied to § 121's ban on expenditures by foreign nationals.  *OPAWL*, 118 F.4th at 777 (majority opinion).  Section 121's expenditure ban cannot survive strict scrutiny.

Strict scrutiny requires Ohio to prove that its speech restriction in § 121 "furthers a compelling interest and is narrowly tailored to achieve that interest."  *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (quotation omitted).  It "is the most demanding test known to constitutional law."  *Free Speech Coal.*, 145 S. Ct. at 2310 (citation modified).  "It is fatal in fact absent truly extraordinary circumstances."  *Id.* (citation modified).

Importantly, in the context of the Free Speech Clause, the Supreme Court has "held only once that a law triggered but satisfied strict scrutiny."  *Id.*  That one time, according to the Court, was in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).  *Holder* upheld 18 U.S.C. § 2339B(a)(1), "which makes it a federal crime to knowingly provide material support or resources to a foreign terrorist organization."  561 U.S. at 8 (citation modified).  There, the compelling interest was "combating terrorism," and the law was narrowly tailored to that interest because it "cover[ed] only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations."  *Id.* at 26, 28.

Turning to § 121, Ohio has identified a compelling governmental interest. It seeks to exclude foreign money from its elections. To achieve this interest, "it follows that the government may bar foreign citizens (at least those who are not lawful permanent residents of the United States) from participating in the campaign process that seeks to influence how voters will cast their ballots in the elections." *Bluman*, 800 F. Supp. 2d at 288 (citation modified).

The problem is that Ohio has not shown that § 121 is narrowly tailored. To meet its burden of showing that § 121 is narrowly tailored, Ohio "must do more than simply posit the existence of the disease sought to be cured." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 307 (2022) (citation modified). The chosen speech restriction must be "actually necessary to achieve its interest." *United States v. Alvarez*, 567 U.S. 709, 725 (2012) (plurality opinion) (citation modified). That "demanding standard" is rarely satisfied. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). Satisfying the standard requires pointing to "record evidence or legislative findings demonstrating the need to address a special problem." *Cruz*, 596 U.S. at 307 (citation modified). "Mere conjecture" will not suffice. *McCutcheon*, 572 U.S. at 210 (quotation omitted). For novel or implausible justifications, States must offer even more evidence to support speech restrictions. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000).

Section 121's ban on political expenditures is novel as applied to lawful permanent residents. Congress, in the Federal Election Campaign Act Amendments of 1974, "barred contributions to candidates from all 'foreign nationals,' defined as all foreign citizens *except lawful permanent residents*." *Bluman*, 800 F. Supp. 2d at 283 (emphasis added) (quoting Pub. L. No. 93-443, § 101(d), 88 Stat. 1263, 1267). Nearly 30 years later, Congress passed the Bipartisan Campaign Reform Act of 2002. The act bars foreign nationals from contributing money "in connection with a Federal, State, or local election"; contributing money "to a committee of a political party; or making an expenditure "for an electioneering communication." 52 U.S.C. § 30121(a)(1). Once again, Congress exempted lawful permanent residents from the ban. *Id.* § 30121(b)(2). And the *Bluman* court, in upholding a ban on foreign nationals making political expenditures and contributions, acknowledged that extending the ban to lawful permanent residents "would raise substantial questions." 800 F. Supp. 2d at 292. By my count, no State, at least at the time Ohio passed § 121, barred lawful permanent residents from making

political expenditures. *See Wagner v. FEC*, 793 F.3d 1, 14 (D.C. Cir. 2015) (en banc) ("The experience of states with and without similar laws is . . . relevant."); *McCutcheon*, 572 U.S. at 209 n.7.

Ohio needed some evidence to support its restrictions on the First Amendment rights of lawful permanent residents. How did Ohio respond to its evidentiary burden? It offered no legislative findings. As far as record evidence, Ohio merely points to media reports and speculates that foreign money may have influenced the outcome of Ohio's special and general elections in 2023. That evidence would probably suffice for speech restrictions on noncitizens who are not lawful permanent residents. But it does nothing to justify speech restrictions on lawful permanent residents. So § 121 is not narrowly tailored because it is "overinclusive." *Brown*, 564 U.S. at 804.

Ohio responds by arguing that the Supreme Court upheld speech restrictions under strict scrutiny in four cases: *Holder v. Humanitarian Law Project*, *Bluman v. FEC*, *Burson v. Freeman*, 504 U.S. 191 (1992), and *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015). Ohio is correct as to *Holder*, but that case does not help it. And Ohio is wrong about *Bluman*, *Burson* and *Williams-Yulee*.

The *Holder* Court upheld a federal law prohibiting providing material support to a terrorist organization against a First Amendment challenge. 561 U.S. at 8. But the Court explained recently that *Holder* "involved an unusual application of strict scrutiny," as it "relied on the deference due to the Executive's evaluation of the facts in the context of national security and foreign affairs." *Free Speech Coal.*, 145 S. Ct. at 2310 (citation modified). In other words, *Holder* is a one-of-one case.

In *Bluman*, the Court summarily affirmed then-Judge Kavanaugh's opinion for the district court holding that the federal ban on foreign nationals (excluding lawful permanent residents) making political expenditures and contributions did not violate the First Amendment. 565 U.S. 1104. "A summary affirmance is an affirmance of the judgment only." *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 560 (2015) (citation modified). The Court does not necessarily adopt a lower court's reasoning or rationale through a summary affirmance. *Mandel*

*v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam). Thus, the district court concluded that the law passed strict scrutiny, not the Supreme Court.

Additionally, because the federal law at issue in *Bluman* exempted lawful permanent residents from the speech restriction, it provides no benefit to Ohio, which did not carve out lawful permanent residents. Ohio can legitimately keep noncitizens who are not lawful permanent residents from participating in the campaign process and potentially influencing how people vote in elections. *See Bluman*, 800 F. Supp. 2d at 288. Those noncitizens are not considered part of the "national community." *Verdugo-Urquidez*, 494 U.S. at 265; *see United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904). On the other hand, this court has referred to lawful permanent residents as "virtual citizens." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 533 (6th Cir. 2007) (quotation omitted).

In *Burson*, the Court upheld a Tennessee law that prohibited the solicitation of votes and the display or distribution of campaign materials within 100 feet of a polling place. 504 U.S. at 193–94, 211 (plurality opinion). A majority of the Court, however, did not agree that the law survived strict scrutiny. Four of the eight justices hearing the case said that it did. *Id.* at 211. Three said it did not. *Id.* at 217 (Stevens, J., dissenting, joined by O'Connor, J., and Souter, J.). And Justice Scalia concluded that the law was not subject to strict scrutiny. *Id.* at 215 (Scalia, J., concurring in the judgment).

In *Williams-Yulee*, the Court held that States may "prohibit judges and judicial candidates from personally soliciting funds for their campaigns." 575 U.S. at 437. As in *Burson*, four justices agreed that the restriction survived strict scrutiny. Four justices disagreed. *Id.* at 462–73 (Scalia, J., dissenting, joined by Thomas, J.); *id.* at 474–78 (Kennedy, J., dissenting); *id.* at 478–79 (Alito, J., dissenting). And Justice Ginsburg, though agreeing that the speech restriction was constitutional, concluded that strict scrutiny did not apply. *Id.* at 457–58 (Ginsburg, J., concurring in part and concurring in the judgment); *see also Free Speech Coal.*, 145 S. Ct. at 2310 n.8.

Perhaps recognizing that this is not "the rare case in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest, *Williams-Yulee*, 575 U.S. at

444 (plurality opinion) (citation modified), Ohio argues that strict scrutiny should not apply. Ohio relies on what the Supreme Court has referred to as the "political function exception." *Bernal v. Fainter*, 467 U.S. 216, 220 (1984) (citation modified). The political-function exception "applies to laws that exclude [noncitizens] from positions intimately related to the process of democratic self-government." *Id.* "The rationale behind the political-function exception is that within broad boundaries a State may establish its own form of government and limit the right to govern to those who are full-fledged members of the political community." *Id.* at 221.

But Ohio cannot rely on this exception because it does not pertain to free-speech challenges. The Court has applied the political-function exception only to equal-protection challenges. When the political-function exception applies, courts do not use strict scrutiny. *Id.* (citing *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982)). And so, with a lesser level of scrutiny, the exception has allowed States to bar noncitizens, without violating the Equal Protection Clause, from: (a) becoming police officers, *Foley v. Connelie*, 435 U.S. 291, 299–300 (1978); (b) becoming probation officers, *Cabell v. Chavez-Salido*, 454 U.S. at 445–46; (c) teaching in public schools, *Ambach v. Norwick*, 441 U.S. 68, 78–81 (1979); (d) serving as jurors, *Perkins v. Smith*, 370 F. Supp. 134, 137–38 (D. Md. 1974), *aff'd*, 426 U.S. 913 (1976); and (e) voting, *Sugarman v. Dougall*, 413 U.S. 634, 649 (1973). The Court has not imported the political-function-exception rationale to free-speech challenges. It therefore does not help Ohio show that § 121 comports with the First Amendment.

In sum, by including lawful permanent residents in its ban on political expenditures, § 121 runs afoul of the First Amendment.

**B.**

*Contribution Ban*. For similar reasons, § 121's ban on political contributions by foreign nationals, including lawful permanent residents, also violates the First Amendment. Again, accepting Ohio's important interest of limiting foreign political participation, § 121's contribution ban is constitutional only if Ohio employs means "closely drawn to match [its] sufficiently important interest." *FEC v. Beaumont*, 539 U.S. 146, 162 (2003) (citation modified).

This requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *McCutcheon*, 572 U.S. at 218 (citation modified). This is still a "rigorous standard of review," which requires Ohio to show that its speech restriction is "narrowly tailored to achieve the desired objective." *Id.* at 197, 218 (quotations omitted); *see also Nat'l Republican Senatorial Comm. v. FEC*, 117 F.4th 389, 405 (6th Cir. 2024) (en banc) (Thapar, J., concurring).

For the same reasons discussed in Part II.A. above, Ohio has failed to show that § 121's contribution ban is narrowly tailored.

### C.

*Remaining Preliminary Injunction Factors.* The district court did not err in finding that the plaintiffs were likely to succeed on the merits of their First Amendment claim. In First Amendment cases, the likelihood-of-success injunctive-relief factor generally has a "determinative effect." *Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 430 (6th Cir. 2025).

The district court also did not abuse its discretion by finding that the remaining factors weighed in favor of granting the plaintiffs a preliminary injunction. The plaintiffs have suffered irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). "The two remaining preliminary injunction factors . . . merge when the government is the defendant." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Ohio would not be harmed by being disallowed from enforcing an unconstitutional law against the plaintiffs. And "it is always in the public interest to prevent violation of a party's constitutional rights." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).

\*          \*          \*

For the reasons above, and for the reasons stated in Judge Davis's dissent from the motions-panel decision, *OPAWL*, 118 F.4th at 786–94 (Davis, J., dissenting), I would affirm the district court's grant of a preliminary injunction to the plaintiffs on their First Amendment claim.